**Herbert CROOK, Receiver, et al., Appellants,**

v.

**WILLIAMS DRUG CO., INC., et al., Appellees.**

**No. 970.**

Court of Civil Appeals of Texas, Tyler.

Oct. 27, 1977.

Rehearing Denied Dec. 1, 1977.

George W. Bramblett, Jr., Haynes & Boone, Dallas, Warren W. Shipman, III, McGown, Godfrey, Decker, McMackin, Shipman & McClane, Fort Worth, for appellants.

Winifred Hooper, Jr., Hooper, Kerry, Chappell & Broils, Forth Worth, Frank Cicero, Jr., Kirkland & Ellis, Chicago, Ill., for appellees.

MOORE, Justice.

This is a suit by Herbert Crook, the statutory Receiver for two domestic insurance companies, Dealers National Insurance Company (Dealers) and Liberty Universal Insurance Company (Liberty), seeking damages or, in the alternative, cancellation of certain transactions allegedly having caused the two insurance companies to become insolvent and thus to be placed in receivership. Named as a defendant was Harold Simmons, individually, and as trustee of a family trust which controlled a conglomerate empire of drug and finance companies, including defendants Contran Corporation, Madigan Corporation and Williams Drug Company, which latter two corporations in turn owned respective controlling interests in Dealers and Liberty. Also named as a defendant was Glenn Simmons, the brother of Harold Simmons.

The Receiver alleged that in November 1969 Harold Simmons and the other defendants instigated a corporate reorganization of Dealers and Liberty consisting of a series of financial transactions herein referred to as the "November Transactions," in which Dealers and Liberty were caused to exchange a vast amount of stocks and other assets with the corporate defendants. Receiver alleged that these transactions proximately led to Dealers' and Liberty's insolvency. As grounds for a cause of action based on breach of fiduciary duty, Receiver alleged that the November Transactions were unfair to both Dealers and Liberty because the stocks and other assets received by them in the course of the transactions were worthless, and as such amounted to a fraud upon their respective creditors and policyholders. Receiver prayed for damages in excess of $10,000,000.00, together with exemplary damages, and in the alternative for a rescission of the November Transactions.

In response to Special Issues Nos. 1 and 2,[1] the jury found that the November Transactions were fair to Dealers and Liberty in every respect. Based on these findings, as well as numerous other findings, the trial court entered a take-nothing judgment against the Receiver from which he perfected this appeal.

We affirm.

1. "SPECIAL ISSUE NO. 1:
    Do you find from a preponderance of the evidence that the November Transactions were fair to Dealers in every respect?
    ANSWER: They were.

"SPECIAL ISSUE NO. 2:
    Do you find from a preponderance of the evidence that the November Transactions were fair to Liberty in every respect?
    ANSWER: They were."

The record is voluminous, consisting of over 7,500 pages of testimony and over a thousand exhibits. A detailed statement of all the facts would neither be possible nor appropriate. Prior to discussing the various points of error brought by the Receiver, we will undertake to outline the posture of the defendants and the two insurance companies as they existed before the November Transactions, and then set forth the evidence showing how and why the November Transactions were consummated.

The record reveals that defendant, Harold Simmons, commenced in business in 1961 after purchasing a drug store in Dallas, Texas. In 1966 he purchased the Williams Drug Company in Waco, Texas, which owned seven drug stores. In 1967 he acquired the Mading, Dugan and Simpson drug store chains. In 1969 Simmons' Mading-Dugan Company (later changed to Madigan) acquired the Ward drug store chain, consisting of thirty-six stores. As a result of the acquisitions, Mr. Simmons' drug business rapidly grew from a family drug store to a chain of ninety-five stores. A controlling interest in each of the corporate entities was owned by the Harold Simmons Family Trust with Harold Simmons as trustee.

In the fall of 1967 Dealers National Insurance was a small fire and casualty company situated in Dallas, Texas. At the suggestion of Harry P. Stuth, a Dallas insurance man, and his associate Charles Caldwell, Mr. Simmons became interested in purchasing Dealers. Shortly thereafter the management of the Mading-Dugan drug chain acquired 83 percent of Dealers for $465,000.00. Mr. Stuth became president and chief operating officer and Harold Simmons, his brother Glenn Simmons, Stuth and Caldwell were made directors. In the year following the acquisition, Stuth gave the directors glowing reports on the progress of the company which led them to follow his recommendation to purchase another insurance company, Liberty Universal, in Forth Worth, Texas.

In the spring of 1968, Mr. Stuth began negotiating with Liberty's president, Hunter McLean, who was a former commissioner of the Texas State Board of Insurance and a majority stockholder of Liberty Universal. Thereafter, in June 1968, upon Stuth's recommendation, Dealers acquired 95 percent of the stock of Liberty for $1,138,000.00. Despite what its previous owner and the company books and records might have disclosed to Mr. Stuth, the evidence shows that shortly after the purchase the State Insurance Board made an examination of the company's financial condition and found that at the time it was acquired it should have been put in liquidation. Thereafter the new management injected new capital into the company which saved it from insolvency.

Soon after Dealers and Liberty had been acquired by the Simmons interest, their respective boards of directors sold most of the securities held in their securities portfolio and reinvested the proceeds in the stocks and securities of other corporations controlled by Simmons. As a result, the vast majority of the assets of the two insurance companies consisted of stocks and securities of the Simmons companies.

In the latter part of 1968, Mr. Simmons and the management of Mading-Dugan became interested in acquiring an interest in Texas Consumer Finance Corporation (TCFC), a multi-state consumer loan business with assets of $40,000,000.00 and lines of credit with major banks throughout the country. In late 1968 Dealers and Liberty, subsidiaries of Mading-Dugan, acquired thirty-five percent of the stock of TCFC.

In December 1968, the management of Mading-Dugan and the management of TCFC cooperated in forming a holding company, called Contran Corporation, to acquire the full ownership of TCFC, and ultimately the entire Mading-Dugan drug store chain. In early 1969 a share for share tender offer was made by Contran with the shareholders of TCFC. Consequently, Dealers and Liberty, which owned 35 percent of TCFC stock, acquired shares in Contran.

On November 23, 1969, shortly before the November Transactions which form the basis of the present suit, the corporate struc-

ture of the Simmons family trust and its ownership of the other corporations are depicted by the following chart:

Harold Simmons served as president and director of Williams, Madigan and Contran, and his brother Glenn served as director of each of the corporations and vice-president of Madigan and Contran. Glenn Simmons served as president and director of both Dealers and Liberty, while Harold Simmons served as board chairman and director until he resigned shortly before the November Transactions. TCFC's Board of Directors consisted of Harold Simmons, Glenn Simmons and a Wallace Jay, President.

In May 1969 Glenn Simmons became concerned that Stuth's personal expenses at Dealers were excessive. Accordingly, an outside auditing firm was called in to conduct a special investigation of Stuth's expenses. The investigation not only disclosed unauthorized cash advances from Dealers to Stuth, but also revealed that, rather than operating at a profit as reported by Stuth, Dealers had incurred a substantial net loss for the year ending April 30, 1969. Because Mading-Dugan (Madigan) was a publicly-owned company subject to regulations by the Securities and Exchange Commission, the company was required to and did issue a press release disclosing the loss sustained by its subsidiary, Dealers. The press release resulted in adverse consequences for both Dealers and Liberty. The market price of the stock of Mading-Dugan and its affiliate, Contran Corporation, suffered a severe decline in value. Because Dealers owned securities of both Mading-Dugan and Contran, the market value of its assets declined severely and as a result its surplus was adversely affected.

The impact of the declining market value of the stocks on the surplus of Dealers concerned the State Board of Insurance. As a result of an examination of both Dealers and Liberty, the State Insurance Board examiner urged management to dispose of the Mading-Dugan and Contran securities to prevent further decline of surplus. The examiner's suggestion was supported by the State Insurance Commissioner who insisted and demanded of Harold Simmons that the Dealers and Liberty insurance operations be separated from the retail drug operations of Mading-Dugan and Contran. In response to such suggestions and demands, Simmons and the management of the defendant companies devised a plan whereby the drug chain securities would be completely eliminated from the securities portfolio of the insurance companies. The plan resulted in a series of eight separate exchanges of securities between the insurance companies and the drug companies. The exchange of the securities having been consummated in the latter part of November 1969, it became known as the "November Transactions."

After these transactions were consummated, Dealers, Liberty and TCFC commenced operating under a separate corporate umbrella known as Liberty Financial Corporation, a holding company organized by the management of the three companies.

During 1970 the nation's economy suffered a recession, bringing about a credit crunch and a period of tight money. As a result, banks and other lending institutions throughout the country began retracting lines of credit. On June 23, 1970, Fort Worth National Bank, TCFC's principal lender, cancelled TCFC's $2,000,000.00 line of credit and notified TCFC's other lenders of its action. This triggered a chain reaction in which other banks cancelled TCFC's lines of credit. Although TCFC had consumer loan accounts receivable in excess of its bank loans, its customers' repayment schedule would not accrue fast enough to

allow TCFC to retire the short term loans due the banks, and it was therefore required to seek protection under Chapter 11 of the Federal Bankruptcy Act. At this time, one of Dealers' banks that held Dealers' TCFC stock as collateral for a loan threatened to foreclose because the TCFC stock became practically worthless. This, in turn, dramatically affected the market value of Dealers' stock held by Liberty. When it became apparent that TCFC would take bankruptcy, Dealers and Liberty immediately notified the State Board of Insurance and consented to immediate receivership in order to prevent foreclosure by Dealers' lenders.

In December 1970 TCFC was sold out of bankruptcy to Colonial Commercial Corporation for $18,000,000 cash and notes for all the stock of TCFC. Under the arrangement Dealers received certain assets and the forgiveness of certain debts in exchange for the TCFC stock owned by Dealers.

The cause was submitted to the jury by 24 special issues. In response to the following numbered special issues, the jury found: (1) that the November Transactions were fair to Dealers in every respect; (2) that the November Transactions were fair to Liberty in every respect; (3) that the fair market value of the stocks, bonds and other assets given up by Dealers in the November Transactions was "$3,122,181 + stocks"; (4) that the fair market value of the stocks and other assets received by Dealers in the November Transactions was "$1,988,468 + stocks"; (4A) that the fair market value of the benefit received by Dealers in the November Transactions due to the cancellation of its $7,750,000 surplus debenture payable to Madigan was $7,750,000; (5) that the fair market value of the land and the stocks given up by Liberty in the November Transactions was $400,000 + stocks"; (6) that the fair market value of the 483,539 shares of Dealers stock received by Liberty in the November Transactions was $2,509,567; (6A) that the fair market value of the benefit received by Liberty in the November Transactions due to the cancellation of its $3,585,000 surplus debentures payable to Williams was $3,585,000; (7) that Contran

and Dealers were mistaken as to the extent of the delinquency of the TCFC loans at the time Contran exchanged TCFC shares for Contran stock held by Dealers; (8) that the mistake was not material; (9) that the Receiver failed to establish that any of the defendants exerted undue influence over Liberty in causing it to enter into the November Transactions; (10) that the Receiver failed to establish that any of the defendants exerted undue influence over Dealers in causing it to enter into the November Transactions; (11) that the Receiver failed to establish exemplary damages in favor of Dealers; (12) that the Receiver failed to establish exemplary damages in favor of Liberty; (13) that the Receiver did not establish that defendants failed to investigate adequately the financial affairs of TCFC in connection with the November Transactions; (16) that in carrying out the November Transactions each of the defendants reasonably exercised his best business judgment; (17) that in carrying out the November Transactions each of the named defendants exercised ordinary care and in good faith relied and acted upon audited financial statements of TCFC prepared by the accounting firm of Price, Waterhouse; (18) that the exchange between Contran and Dealers in which Dealers received 3,322,123 shares of TCFC stock from Contran in return for 3,022,000 shares of Contran stock was fair to Dealers in every respect; (19) that the fair market value of those items received by Dealers from the sale of the assets and stock of TCFC to Colonial Commercial Corporation through the Bankruptcy Court at the time of sale was "18 million" dollars; (20) that the Receiver failed to establish that when Dealers acquired the TCFC stock on November 28, 1969, TCFC had liabilities which exceeded its assets; (21) that the Receiver failed to establish that Dealers did not have surplus immediately before payment of the $7,750,000 surplus debenture held by Madigan; (22) that Dealers had a surplus of "$7,750,000 + " at such time; (23) that the Receiver failed to establish Liberty did not have surplus immediately before the payment of

its $3,585,000 surplus debentures held by Williams; and (24) that Liberty had a surplus of $3,585,000 at such time.

Based on the foregoing findings, the trial court entered a take-nothing judgment against the Receiver on October 23, 1975. Two days before the entry of judgment, the Receiver filed a lengthy motion for judgment notwithstanding the verdict, but the record fails to show that the motion was ever presented to or acted on by the trial court.

■ The record, however, reveals that the Receiver filed a motion for new trial. In his motion for new trial the Receiver had numerous assignments asserting that the trial court erred in overruling his motion for judgment n. o. v. These assignments were brought forward in the brief by points of error Nos. 1, 3, 5, 7, 11, 13, 16, 20, 21, 23, 26, 29, 32, 34, 36, 38, 41, 44, 49, 50, 51 and 52. Before discussing the case on its merits we are confronted with the problem of whether these points were properly preserved for appellate review. As stated, the record shows that the motion n. o. v., although filed, was never presented to or acted on by the trial judge. It therefore must be regarded as a nullity. Consequently, the Receiver's complaint in his motion for new trial asserting that the court erred in overruling his motion for judgment n. o. v. is without foundation. In this state of the record, nothing is preserved for appellate review. *Commercial Standard Ins. Co. v. Southern Farm Bureau Casualty Ins. Co.,* 509 S.W.2d 387 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n. r. e.); *Ladd v. Knowles,* 505 S.W.2d 662 (Tex.Civ.App.—Amarillo 1974, writ ref'd n. r. e.); *Murphy v. Maroney,* 456 S.W.2d 787 (Tex.Civ.App.—Waco 1970, writ ref'd n. r. e.). The aforementioned points of error are accordingly overruled.

By the second and fourth points of error the Receiver contends that the trial court erred in rendering judgment for defendants because there was "insufficient" evidence to support the jury's findings on Special Issues Nos. 1 and 2 that the November Transactions were fair to Dealers and Liberty in every respect.

■ In considering a point of error asserting the evidence is "insufficient," we of course must consider and weigh all the evidence in the case, both that in favor of the verdict and that contrary thereto, and arrive at a conclusion as to whether the evidence is factually insufficient to support the verdict or whether the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

Before passing on the question of whether the evidence was factually insufficient to support the jury's findings of "fairness", we think it would be appropriate to set forth the trial court's instructions relating to the duty owed by defendants to Dealers and Liberty and the concept of "fairness" as defined by the court. In this connection the court instructed the jury as follows:

"Corporate officers and directors and other persons who by virtue of their controlling interest or influence in such corporations are fiduciaries and their authority and powers are vested in them in trust for the benefit of the corporations, their shareholders and in case of an insurance company, its policy holders.

"In their transactions or dealings with other corporations, which they also represent or influence, such persons, corporations or legal entities must exercise a high degree of good faith and dedicate their uncorrupted business judgment for the benefit of all of such corporations.

.    .    .    .    .

"The concept of 'fairness' has no exact special legal definition, but rather should be understood in the ordinary meaning of the word as used in everyday life. You, the jury, should apply your own good common sense and consider all of the relevant evidence admitted before you in determining whether any particular transaction or series of transactions, was 'fair'. Among the factors which you may consider in making such a determination is [sic] whether Dealers and Liberty re-

ceived value in these transactions substantially equivalent to what they gave up; whether the transactions were at fair market value or constituted a better bargain than Dealers and Liberty could otherwise have obtained in dealings with others at arms length; whether there was a detriment to Dealers and Liberty as a result of these transactions; whether defendants siphoned off a gain belonging to Dealers and Liberty directly or through corporations they controlled and whether full disclosure of all material facts was made.

"In this case, as a matter of law, you are instructed that Harold Simmons, Glenn Simmons, Williams, Contran, Madigan and Simmons Trust were fiduciaries of Dealers and Liberty and that the burden of proving the fairness of the November Transactions to Dealers and Liberty rests upon such defendants."

█ It is a well-recognized principle of law that in transactions between boards of directors of corporations having common members, as here, such transactions will be guarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged, the burden is upon those who would maintain them to show their entire fairness and, where a sale is involved, the full adequacy of the consideration. *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1919); *Felty v. National Oil Co. of Texas,* 155 S.W.2d 656 (Tex.Civ.App.—San Antonio 1941, no writ).

█ In an effort to discharge their burden of proving that the November Transactions were fair in every respect, defendants called eight witnesses.

Dale Wood, Contran's financial vice-president, testified that shortly after the Texas Insurance Commission suggested that Dealers and Liberty be divested of their stocks and securities in the drug chains, he, together with Harold Simmons and other officers of the insurance companies and the drug chains, concluded that it would be to the advantage of the insurance companies

for them to trade their drug chain securities for stock and securities of TCFC. He explained that they concluded that this exchange would be advantageous because TCFC had an audited book value of $12,-000,000, its stock was the only asset available that would fit the requirements of the Texas Insurance Commission and it was thought that as a result of the exchange TCFC would be in a position to loan money to both Dealers and Liberty. He further testified that he was familiar with each of the eight transactions comprising the November Transactions and that in his opinion each transaction was fair to Dealers and Liberty because both companies received quid pro quo in each of the exchanges. Defendants Harold Simmons and Glenn Simmons likewise testified that they were familiar with all eight of the transactions and believed each transaction was fair. Robert Wall, who became a member of the Board of Directors of both Dealers and Liberty immediately following the November Transactions, testified he worked with the comptroller of the two insurance companies in an effort to insure the fairness, legality and adequacies of the November Transactions, and stated he "knew the transactions were fair." Keith Kelly, attorney for Dealers and Liberty, testified the transactions were legal and of substantial benefit to the insurance companies. Guy Ewing, a director of Dealers, testified he had no reason to question the fairness of the November Transactions. Will Davis, an attorney specializing in insurance law who was employed by the defendants to assist in the November Transactions, testified that Dealers and Liberty were better off after the November Transactions than before.

Clyde Buck, an investment banker with Rotan Mosle, Inc., who was employed by the Receiver to determine the value of TCFC's and Dealers' stock, was one of Receiver's key witnesses. He testified that the total dollar value of the assets given up by Dealers in the November Transactions amounted to approximately $7,000,000, whereas the total dollar value of the assets received by Dealers in return was of no

value. He further testified that the total dollar value of the assets given up by Liberty was approximately $1,000,000, whereas the total dollar value of the assets received by Liberty in the November Transactions was of no value. He therefore concluded that all eight of the November Transactions were unfair to Dealers and Liberty.

Although the Receiver challenged the fairness of each of the eight November Transactions, he states in his brief that the crux of this entire controversy resolves itself into a question of whether the final transaction in which Dealers traded 3,020,-000 shares of Contran stock for 3,322,123 shares of TCFC stock was unfair. He argues that this particular transaction was unfair because the evidence conclusively shows that the value of the Contran shares given up by Dealers had a market value of $6,902,565, while the TCFC stock received by Dealers in exchange was worthless since TCFC was actually insolvent at the time of the transaction. He takes the position that this particular transaction, standing alone, makes the November Transactions as a whole unfair to Dealers and argues that, based on this transaction, Dealers should be awarded damages in the amount of at least $6,902,565. Defendants agree that this particular transaction is the most crucial of the eight.

In an effort to prove that TCFC was insolvent and its stock worthless, the Receiver called numerous witnesses who testified that, based on their investigations, TCFC was insolvent because of major delinquencies in its loan portfolio. According to their testimony, many of TCFC's branch managers had engaged in deceptive loan practices in order to make it appear that the delinquencies in their branch office were minimal when in fact a large percentage of the loans was uncollectible. They estimated that approximately one-half of TCFC's loan portfolio was delinquent and uncollectible. Clyde Buck testified that this particular transaction was unfair to Dealers because he determined that TCFC was insolvent and that, therefore, the stock received by Dealers was worthless. He testified he reached this conclusion based on

his estimation that the installment loans held by TCFC were worth only $20,000,000 as opposed to a book value of $37,000,000, and that as a consequence TCFC's total assets amounted to only $34,000,000, an amount substantially less than the company's senior liabilities of $41,000,000.

In rebuttal, defendants offered the annual audit reports prepared by Price Waterhouse & Co., a large accounting firm employed by TCFC as its outside auditor from 1966 through 1969, showing that TCFC had operated at a profit during each of those years. The 1968 audit report showed that TCFC had a loan portfolio for that year of approximately $43,000,000 and loan losses of approximately $1,600,000, which loan loss figure had been practically the same in prior years. The audit reports also showed that the same amount of reserves for bad loans had been established in each of such prior years and that the reserves were adequate to take care of the losses. There was nothing in the audit reports suggesting that the employees of TCFC had engaged in any significant amount of deceptive loan practices covering up loan delinquencies, nor did the reports indicate that the loan delinquencies were considered to be excessive. Defendants offered testimony showing that they relied on these reports, especially the 1968 report, in determining the fairness of this transaction.

Allen B. Coleman, Dean of the Southern Methodist University School of Business Administration and formerly professor at Harvard and Stanford Universities, was employed by the defendants to evaluate the fairness of this particular exchange. He testified that, after relying on the Price Waterhouse reports and the financial records of TCFC and Contran, he applied the capitalized earning method of appraising the value of both companies and concluded that at the time of the November Transactions the TCFC stock had a value of $2.35 per share and the Contran stock a value of $2.21 per share. Based on these findings, he testified that the Contran stock given up by Dealers had a total value of $6,678,620 and the TCFC stock received by Dealers in

exchange a value of $7,806,989. He therefore concluded that, as Dealers received TCFC stock having a greater value than the Contran stock which it gave up, the transaction was fair to Dealers.

Arthur Styles, Vice-President of the investment banking firm of Kidder Peabody & Co., testified that he had been employed by the defendants to evaluate the Contran and TCFC stock at the time of the transaction in question. He testified that upon applying the book equity per share formula, as well as the earnings per share formula, it was his conclusion that the exchange by Dealers of its Contran stock for the TCFC stock was fair.

The comparative value of the securities exchanged in each of the eight November Transactions is the subject of much conflicting testimony. After a review of the record as a whole, we have concluded that the evidence is not factually insufficient to support the jury's verdict in response to Special Issues Nos. 1 and 2, finding that the November Transactions were fair to Dealers and Liberty in every respect, nor are such findings against the overwhelming weight and preponderance of the evidence. Receiver's second and fourth points are accordingly overruled.

■ By the twenty-second point the Receiver seeks a reversal on the ground that the jury's finding on Special Issue No. 8 is against the overwhelming weight and preponderance of the evidence. This issue was conditionally submitted under Special Issue No. 7. In response to Special Issue No. 7 the jury found that the parties were mistaken as to the extent of the delinquencies of TCFC's outstanding loans at the time Dealers traded 3,020,000 shares of Contran stock for 3,322,123 shares of TCFC stock. In Special Issue No. 8, the jury was requested to find whether the mistake constituted a material mistake. The jury answered in the negative.

After weighing and balancing all of the evidence adduced in this regard, both that in favor of the finding as well as that contrary thereto, we find that we cannot agree with the contention that the finding

is contrary to the overwhelming weight and preponderance of the evidence. The point is overruled.

■ In the forty-seventh point, the Receiver complains of the action of the trial court in refusing to submit his specially requested instruction reading as follows:

"Plaintiffs would request the court additionally to instruct the jury that in considering whether or not the defendants reasonably exercised their best business judgment in consummating the November Transactions, that the jury be instructed that this consideration has absolutely no bearing whatsoever on the findings of fairness in this case."

In view of the broad definition of fairness and the sound instructions as to fiduciaries' standard of care given in the charge, we do not believe that the error, if any, in refusing the specially requested instruction amounted to such a denial of the rights of the plaintiff as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, T.R. C.P. The point is overruled.

■ Under the fifty-third point the Receiver contends that the trial court erred in admitting the testimony of Dr. Coleman, defendant's expert witness, because he refused to consider certain evidence as true in responding to several hypothetical questions propounded by the Receiver's counsel, thereby rendering his opinion incomplete and misleading. We find nothing in the record showing that any objection or complaint was made at the time Dr. Coleman gave his testimony in this regard. No complaint having been made in the trial court, no predicate for appellate review exists. *T. & L. Lease Service, Inc. v. Biddle,* 500 S.W.2d 186 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); *Royal v. Cameron,* 382 S.W.2d 335 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.). The point is overruled.

The Receiver further complains of the jury's findings to Special Issues Nos. 3 through 4–A, 5 through 6–A, 16, 18, 19, 20, 21, 22, 23 and 24, on the ground that the evidence is factually insufficient to support

such findings. Under the view we take of the record, each of these findings was rendered irrelevant and immaterial by virtue of the jury's findings on Special Issues Nos. 1 and 2 that the November Transactions were fair to Dealers and Liberty in every respect. We deem Special Issues Nos. 1 and 2 to be the controlling issues in the case. The jury's findings on the other issues complained of were merely findings on the fairness of some particular facet of the November Transactions or on some particular aspect of the concept of fairness. They therefore constituted nothing more than fragmentations of the broad issue of whether the November Transactions were fair in every respect. The issues in question were designed primarily for the purpose of determining whether Dealers and Liberty received quid pro quo in the exchange of securities in certain specified fragments of the November Transactions. While the jury's findings to Issues 3, 4, and 5 were incomplete and therefore meaningless, all the other issues complained of were answered in a manner consistent with the jury's findings in response to Special Issues Nos. 1 and 2.

While Issues Nos. 1 and 2 are broad and embrace the question of fairness of all eight of the November Transactions collectively, the Receiver registered no objection to the submission of the issues in this form. The record shows that the cause was tried and submitted upon the theory that Special Issues Nos. 1 and 2 were the controlling issues. In view of the jury's findings that the November Transactions were fair to Dealers and Liberty in every respect, all such other issues complained of are immaterial to the controlling issues in the case. *Buck v. Reed,* 370 S.W.2d 867 (Tex.1963); *Goeke v. Baumgart,* 92 S.W.2d 1047 (Tex. Civ.App.—Beaumont 1936, no writ); *McElwrath v. City of McGregor,* 58 S.W.2d 851 (Tex.Civ.App.—Waco 1933, writ dism'd). These issues, which were unconditionally submitted, would become material had the jury returned a verdict favorable to the Receiver finding that the November Transactions were not fair to Dealers and Liberty. They would in that event disclose in which respects the transactions were unfair and thereby determine the rights of the parties. Since the jury found that the November Transactions were fair in every respect, the Receiver is in no position to contend that Special Issues Nos. 1 and 2 are not the controlling issues and that he is therefore entitled to a reversal on the ground that the evidence was factually insufficient to support the findings to the issues in question. *Continental Casualty Co. v. Street,* 379 S.W.2d 648 (Tex.1964). For the reasons stated points 6, 8, 9, 12, 14, 17, 24, 27, 30, 33, 35, 37, 39, 40, 42, 43, 45 and 46 are overruled.

All points which have not been discussed have been considered and found to be without merit and are accordingly overruled.

The judgment is affirmed.