**STATE BANKING BOARD et al., Appellants,**

v.

**VALLEY NATIONAL BANK et al., Appellees.**

No. 13212.

Court of Civil Appeals of Texas, Austin.

July 30, 1980.

Rehearing Denied Aug. 26, 1980.

**416**

Mark White, Atty. Gen., Yolanda Martin, Asst. Atty. Gen., Shannon H. Ratliff, McGinnis, Lochridge & Kilgore, Austin, for appellants.

Larry Temple, Austin, for appellees.

SMITH, Justice.

In May, 1978, appellants Glen E. Roney, Vernon F. Neuhaus, Jr., Paul G. Veale, Jack A. Whetsel, Joseph V. LaMantia, and Vannie E. Cook, Jr., filed application with appellant State Banking Board for a charter for the proposed Texas State Bank of McAllen, Texas.

A hearing on the application was held in September, 1978. At that time, appellees, Valley National Bank of McAllen and Metropolitan National Bank of McAllen, appeared and protested the application on the grounds that there was no public necessity or justification for the proposed bank and that it was not in the public interest ". . . to give another bank to the individuals who already control more than a majority of the banking in McAllen."[1] In December, 1978, the Banking Board determined that applicants had met their burden by proving the existence of the statutory criteria prerequisite to the granting of a charter and entered an order approving the application.

---

**1.** Appellees have reference to applicants Roney, Neuhaus, Veale, and Whetsel, who are also stockholders in and directors of the McAllen State Bank.

After appellees' motion for rehearing was overruled by the Banking Board, this suit for judicial review of the Board's action was instituted in the district court of Travis County in March, 1979.

In December, 1979, the district court rendered judgment that the State Banking Board's order granting the application for charter of the proposed bank was not supported by substantial evidence that the proposed directors had sufficient banking experience, ability and standing to render success of the proposed bank probable, nor that the applicants were acting in good faith. In addition, the district court found that the Board's order did not contain the requisite recitation of underlying facts with regard to the statutory requirement of experience, ability and standing or the statutory requirement of action in good faith. The case was remanded to the Banking Board with instructions to deny the application for a charter for the proposed bank.

In essence, the district court concluded that, absent substantial evidence to the contrary, dual service by the four proposed directors also serving on the Board of the McAllen State Bank precluded a finding of experience, ability and standing to render success of the proposed bank probable or a finding of good faith by the Banking Board.[2] By crosspoints, appellees contend that applicants had the burden of proving by substantial evidence that this same dual service did not negate the statutory requirements of public necessity and probability of profitable operation. We disagree.

■ A director of a bank occupies the position of a fiduciary toward the banking corporation. *First State Bank of Temple v. Metropolitan Casualty Insurance Company of New York*, 125 Tex. 113, 79 S.W.2d 835,

98 A.L.R. 1256 (1935). Directors of corporations are not strictly trustees, however, and the character and consequences of their acts have been determined on the basis of the facts of each case. *Paddock v. Siemoneit*, 147 Tex. 571, 218 S.W.2d 428, 7 A.L.R.2d 1062 (1949). In general, the fiduciary relationship requires a high degree of care and loyalty by the director toward the corporation. *Kinzbach Tool Co. v. Corbett–Wallace Corporation*, 138 Tex. 565, 160 S.W.2d 509 (1942).

■ It is well established that a director of one business corporation may sit on the board of a competing business corporation. Furthermore, subject to a "jealous" review for fairness by the courts, such an interlocking director may even vote on transactions between those corporations without violating any fiduciary duty to either. *Geddes v. Anaconda Copper Mining Company*, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1920); *Crook v. Williams Drug Co., Inc.*, 558 S.W.2d 500 (Tex.Civ.App.—Tyler 1977, writ ref'd n. r. e.); *Reynolds–Southwestern Corporation v. Dresser Industries, Inc.*, 438 S.W.2d 135 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n. r. e.); Hamilton, Business Organizations § 715 (1973). As interlocking directorships are permissible between business corporations, we see no reason why they should not also be permissible between banking corporations.

Texas Rev.Civ.Stat.Ann. art. 342–305(A) (1973) sets out the criteria prerequisite to the granting of a state bank charter in Texas:

"Applications for a State bank charter shall be granted only upon good and sufficient proof that all of the following conditions presently exist:

"9. There is not substantial evidence which reasonably supports the finding by the State Banking Board that the applicants for charter for the Texas State Bank are acting in good faith as trustees with fiduciary duties to two different sets of shareholders of two competing banks drawing from and serving the same market area."

---

**2.** "7. There is not substantial evidence which reasonably supports the finding of the State Banking Board that the proposed directors of the Texas State Bank also serving on the Board of the McAllen State Bank have sufficient banking experience, ability and standing so as to be able to serve both banks, simultaneously, each drawing from and serving the same market area in order to render success of the new bank *probable*.

(1) A public necessity exists for the proposed bank;

(2) The proposed capital structure is adequate;

(3) The volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank;

(4) The proposed officers and directors have sufficient banking experience, ability and standing to render success of the proposed bank probable; and

(5) The applicants are acting in good faith.

The burden to establish said conditions shall be upon the applicants."

■ Texas Rev.Civ.Stat.Ann. art. 342–101, *et seq.* (1973), has been held to provide a complete system of laws governing the organization of state banks in Texas. *Robertson v. State*, 406 S.W.2d 90 (Tex.Civ.App.—Fort Worth 1966, writ ref'd n. r. e.). Consequently, the *only* criteria that must be shown to exist before a charter may be granted are those specifically listed in Article 342–305(A). As dual service is not prohibited by the statute, its existence is not required to be negated before the charter may be granted.

■ This is not to say that dual service may not be considered by the Banking Board in arriving at a decision as to whether to grant or to deny a charter. Dual service is certainly a factor to be considered when determining the existence of the statutory criteria of public necessity, capital structure, probability of profitable operation, banking experience, ability and standing, or good faith. However, it is *only* a factor and, like the many other factors that may figure into a final decision, it may be ascribed a greater or a lesser significance in comparison to the other evidence before the Board. *See: State Banking Board v. Airline National Bank*, 398 S.W.2d 805 (Tex. Civ.App.—Austin 1966, writ ref'd n. r. e.).

Appellees cite us to no cases that have held that the mere fact that proposed directors will serve simultaneously as directors of another bank is sufficient to deny a charter to a proposed bank. In fact, past cases demonstrate that dual service has been accepted as a matter of course both by the Board and the courts. *See: State Banking Board v. Airline National Bank, supra; Chimney Rock National Bank of Houston v. State Banking Board*, 376 S.W.2d 595 (Tex.Civ.App.—Austin 1964, no writ).

■ In summary, to affirm the action of the district court would be to engraft onto Article 342–305(A) an additional requirement that no proposed director have any interest in another banking institution. Such action is clearly beyond the jurisdiction of this Court. *State v. Reyna*, 160 Tex. 404, 333 S.W.2d 832 (1960).

By crosspoint, appellees claim that the district court erred in refusing to admit into evidence a previous order of the Banking Board denying a charter to the proposed First State Bank of Killeen. In that case, the Board allegedly attached some importance to the dual service of the proposed directors. The district court refused to consider the Killeen order because it was not introduced into evidence before the Board but merely attached as an exhibit to the motion for rehearing.

■ Texas Rev.Civ.Stat.Ann. art. 6252–13a, Section 19(d)(3) (Supp. 1980) confines review of agency action to the record made before the agency, "except that the court may receive evidence of procedural irregularities alleged to have occurred before the agency but which are not reflected in the record." The record in an administrative appeal includes the motion for rehearing filed before the agency, but it does not necessarily include exhibits attached thereto.

■ Under Rules 371, 376 and 377, *Texas Rules of Civil Procedure* (Supp. 1980), an exhibit must be tendered and admitted into evidence in order to become a part of the record on appeal. Exhibits tendered but not admitted into evidence are not a part of the record and cannot be considered on appeal. *City of Mission v. Popplewell*, 156

Tex. 269, 294 S.W.2d 712 (1956); *Lone Star Cotton Mills v. Thomas*, 227 S.W.2d 300 (Tex.Civ.App.—El Paso 1949, no writ). *See: Brown v. American Transfer & Storage Company*, 601 S.W.2d 931, 23 Tex.Sup. Ct.J. 426 (June 18, 1980).

■ The legislature is presumed to have taken notice of prior court decisions construing these rules when it enacted the Administrative Procedure Act. *United Savings Association of Texas v. Vandygriff*, 594 S.W.2d 163 (Tex.Civ.App.—Austin 1980, writ ref'd n. r. e.); *Humble Pipe Line Co. v. State*, 2 S.W.2d 1018 (Tex.Civ.App.—Austin 1928, writ ref'd). As the legislature did not provide to the contrary in the Administrative Procedure Act, we hold that exhibits must be admitted into evidence at the hearing before the agency in order to become a part of the record on appeal. Merely attaching an exhibit to a motion for rehearing will not suffice to make that exhibit a part of the record.

Accordingly, as merely attaching the Killeen order to the motion for rehearing did not make the exhibit a part of the record and failure of appellees to introduce the evidence before the Board cannot be considered "procedural irregularity," the district court properly refused to consider that order on appeal.

The district court also found that the Banking Board failed to support its ultimate findings of experience, ability and standing and action in good faith with an adequate recitation of underlying facts. Likewise, appellees, by crosspoints of error, raised this same issue with respect to the findings of public necessity and probability of profitable operation.

In essence, the issue before this Court is whether the Board was required to recite the facts underlying its *rejection* of appellees' dual service arguments in its order.

Ultimate findings of the Banking Board that are couched in statutory language must be accompanied by a "concise and explicit statement of the underlying facts *supporting* the findings." Tex.Rev.Civ. Stat.Ann. art. 6252–13a, Section 16(b)

(Supp. 1980); *Gage v. Railroad Commission*, 582 S.W.2d 410 (Tex. 1979). (Emphasis added.)

The purposes in requiring underlying facts are to require a full consideration of the evidence and serious appraisal of the facts on the part of the administrative agency; to inform the protestants of the facts found so that they may intelligently prepare and present an appeal to the courts; and to assist the courts in properly exercising their function of reviewing the order. *Security Savings and Loan Ass'n of Dickinson v. Lewis*, 515 S.W.2d 392 (Tex. Civ.App.—Austin), *subsequent opinion*, 547 S.W.2d 710, *rev'd on other grounds*, 560 S.W.2d 930 (Tex. 1978).

■ The Board is not required to comment on every aspect of the record that may be relevant to its ultimate findings. *Mutual Building and Loan Association v. Lewis*, 572 S.W.2d 771 (Tex.Civ.App.—Austin 1978, no writ). However, its underlying facts must "be such that a reviewing court can fairly and reasonably say that they *support* the 'ultimate findings of fact required for the decision.'" *Gage v. Railroad Commission, supra.* (Emphasis added).

■ Section 16(b) of Article 6252–13a, requires the Board to state *only* those findings that *support* its ultimate statutory findings. The Board is not required to state facts that it *rejected* and upon which it did *not* rely for support of its ultimate findings.

As we have previously pointed out, possible dual service by the proposed directors was merely a factor before the Board for its consideration in determining the ultimate question of the existence of the statutory criteria listed in Article 342–305(A). It appears from both the record and the order that the Board found the other evidence presented by the applicants to outweigh the counterevidence of dual service presented by appellees. As the order reveals that the Board supported its ultimate conclusions on those other grounds, the Board was not required to state the reasons why it rejected appellees' dual service arguments.

The only remaining issues before this Court are whether the order of the State Banking Board granting the application for charter of the proposed Texas State Bank is supported by substantial evidence and whether that order adequately recites the factors underlying its ultimate statutory conclusions.

■ It is now firmly established that appeal from orders of the State Banking Board are governed by the substantial evidence rule. Tex.Rev.Civ.Stat.Ann. art. 342–115(4) (1973); *Chemical Bank & Trust Company v. Falkner*, 369 S.W.2d 427 (Tex. 1963). *See*: McCalla, *The Administrative Procedure and Texas Register Act*, 28 Baylor L.Rev. 445, 469 (1976).

■ "Substantial evidence" need not be much evidence, and though "substantial" means more than a mere scintilla, or some evidence, it is less than is required to sustain a verdict being attacked as against the great weight and preponderance of the evidence. *Purolator Courier Corp. v. Railroad Commission*, 548 S.W.2d 486 (Tex.Civ.App. —Austin 1977, writ ref'd n. r. e.); *State Banking Board v. Proposed Central Park Bank of Dallas*, 522 S.W.2d 717 (Tex.Civ. App.—Austin 1975, writ ref'd n. r. e.). *See*: Reavley, *Substantial Evidence and Insubstantial Review in Texas*, 23 Sw.L.J. 239 (1969).

■ To determine whether the Board's decision finds reasonable support in substantial evidence, we must determine whether the evidence as a whole is such that reasonable minds could not have reached the conclusion that the Board must have reached in order to justify its action. *Hardy Street Investors v. Texas Water Rights Commission*, 536 S.W.2d 85 (Tex.Civ. App.—Waco 1976, writ ref'd n. r. e.).

■ As the Banking Board's order is presumed to be supported by substantial evidence, appellees had the burden before the district court to demonstrate that reasonable minds could not have reached the same conclusion as that of the Board.

*United Savings Association of Texas v. Vandygriff, supra; First National Bank, Grapevine v. State Banking Board of Texas*, 419 S.W.2d 878 (Tex.Civ.App.—Austin 1967, writ ref'd n. r. e.).

■ All things considered, if there exists evidence which would support either granting or denying the application, the Board's order is entitled to be given full effect. *Texas Aeronautics Commission v. Braniff Airways, Inc.*, 454 S.W.2d 199 (Tex. 1970); *Mineola State Bank v. First National Bank of Mineola*, 574 S.W.2d 246 (Tex. Civ.App.—Austin 1978, writ ref'd n. r. e.).

■ In relation to the statutory criteria of public necessity and probability of profitable operation, there is evidence in the record that McAllen's economy is growing and expanding; that the labor force is growing; that the economy shows increased earnings and gross taxable sales; that there exists a strong commercial retail environment; that there has been an increase in housing construction permits; and that the financial community has benefited from the economic prosperity. The evidence also shows that the McAllen State Bank holds approximately 56% of all McAllen bank deposits, 57% of all McAllen bank loans, and 56% of all McAllen bank assets; that McAllen State Bank's dominance in the marketplace is on the increase; and that four of the proposed directors of the Texas State Bank are on the board of the McAllen State Bank. There is also testimony that the Valley National Bank and the Metropolitan National Bank have experienced a decline in total assets during the last year.

Our study of the record and the Board's order demonstrates that the Board considered all the evidence before it but concluded that the financial, economic and demographic evidence of McAllen's growth was more persuasive. There is substantial evidence in the record to justify their action. *Texas Aeronautics Commission v. Braniff Airways, Inc., supra.* The Board's

findings in this regard are fairly and reasonably supported by underlying facts contained in its order.[3] *Gage v. Railroad Commission, supra.*

3. The record before the Board contains almost 350 pages of transcription of oral testimony plus 14 exhibits comprising many additional pages. From this, the Board has been able to review the statistical barometers of the area, to view it from photographs and maps and to examine the testimony description of the area and the banking situation as it relates to it. The applicants presented an economic expert witness (Dr. James R. Vinson) and so did the protestants (Dr. George W. Berry). As frequently occurs in contested cases of this kind, the expert witnesses expressed contrary opinions and conclusions from their evaluations of the area. The Board has had an opportunity to consider the entirety of the record and has been able to assess the area, its need for a bank and its ability to support a bank. Taking into account the testimony of all of the witnesses as well as the documentary evidence submitted by the parties, the Board has been able to reach its own ultimate conclusion from the record.

The Board finds that the City of McAllen and Hidalgo County are experiencing strong economic growth. The factors which lead the Board to this conclusion will be recited later in this order. The Board, after examining all the evidence, agrees with the opinion expressed by Dr. Vinson (R. 138) that the community to be served by this new bank will be the entirety of the City of McAllen. While the City of McAllen is the community to be served, the Board has also studied the economic indicators pertaining to Hidalgo County because the Board believes those indicators are germane to the issues at hand in as much as the City of McAllen is a part of Hidalgo County and some economic indicators are only available on a county wide basis.

In every decennial since 1900, Hidalgo County has increased in population. As of the year 1970 the County's population stood at 181,535 and by 1976 (July), the Bureau of the Census estimated the population to be 230,300 (Applicants' Exhibit 10, page 2). Between 1960 and 1970 Hidalgo County experienced a modest growth of only 631 people but during the same period the City of McAllen grew by 4,908 and remained the largest concentration of population in the County. (Applicants' Exhibit 10, page 1).

In 1920 the City of McAllen had a population of 5,331 and by 1970 the population had reached 37,636. In 1975 the population had grown to 48,563 and Dr. Vinson estimated the 1978 population to be 54,700 (Applicants' Exhibit 10, page 27). Between 1971 and 1977 the average daily attendance of the McAllen Independent School District had grown by over 2,000 students to stand at 13,754. (Applicants' Exhibit 10, page 28). Based upon past growth trends, the rise in school attendance as well as labor force estimates and housing construction to be mentioned later, the Board finds Dr. Vinson's estimate of the population to be reasonable and credible and adopts it as one of the underlying facts.

As other indicators of the healthy and expanding economy of McAllen and Hidalgo County the Board has examined labor statistics, earnings and income data, bank debits, sales figures, bank deposits, savings and loan deposits, construction, oil and gas production, and the photographic evidence introduced at the hearing.

In April of 1974 the civilian labor in Hidalgo County was 70,743 and in April of 1978 this figure stood at 85,925 for a 21.5% increase in just four years. The employment during that same period rose from 65,769 to 78,160. (Applicants' Exhibit 10, page 9). In the City of McAllen, the labor force grew from 17,448 in July of 1977 to 18,640 in July of 1978. The employment figure rose from 15,638 to 16,674 during the same period. (Applicants' Exhibit 10, page 31).

Earnings and incomes have posted impressive gains during the last several years. In 1972 total earnings in Hidalgo County were $324,228,000 and by 1976 these earnings were $543,371,000. Private nonfarm earnings had risen from $212,689,000 to $392,107,000 during this period and the retail trades accounted for $96,468,000 in earnings in 1976. (Applicants' Exhibit 10, page 10). Dr. Vinson estimated the total earnings in Hidalgo County to be $598,201,000 in 1977 and $652,995,000 in 1978. (Applicants' Exhibit 10, page 11). From a study of the evidence the Board finds these estimates to be reliable and another indicator of the expanding economy.

In a like manner the total personal income of Hidalgo County residents has continued to rise. In 1972 the total personal income was $455,122,000 and by 1976 this figure was $768,744,000. The Board finds that Dr. Vinson's estimates of total personal income for 1977 of $849,527,000 and for 1978 of $924,808,000 to be reliable and they are adopted as one of the underlying facts. (Applicants' Exhibit 10, pages 12 13).

The gross sales of reporting units have continued to rise over the years. In 1968 gross sales amounted to $409,040,168 and since that time they have continued to show increases: (Applicants' Exhibit 10, page 15).

| Year | Amount |
| --- | --- |
| 1969 | $532,921,767 |
| 1970 | 556,543,376 |
| 1971 | 585,203,996 |
| 1972 | 660,164,882 |
| 1973 | 804,180,263 |
| 1974 | 992,196,384 |
| 1975 | 1,076,553,718 |
| 1976 | 1,243,451,114 |
| 1977 | 1,423,282,337 |

As to the statutory criteria of sufficient banking experience, ability and standing and of action in good faith, the record firmly establishes the business, church, civic and professional credentials of each proposed director. In addition, the record also establishes that the charter application, executed under oath, stated that it was "made in good faith, with the purpose and intent that the affairs and business of the proposed

Note 3—Continued

In the first quarter of 1978 the sales were $385,828,368. This represents a 14.8% increase over the first quarter of 1977 and indicates to the Board that the economy is continuing to show healthy increases.

Gross taxable sales have also risen in Hidalgo County. (Applicants' Exhibit 10, page 16). In 1969 these sales were $264,970,986 and by 1977 they stood at $778,956,082. The first quarter of 1978 reflected taxable sales of $713,141,097 for a 25.2% increase over the first quarter of 1977. The City of McAllen sales tax allocations for the period 1969 1974 also increased. (Applicants' Exhibit 10, page 32). In 1969 the allocation was $958,382 (representing sales of $95,838,200) and in 1974 the allocation was $1,862,021 (representing sales of over $186,-200,000). In 1975 the reporting procedure was changed but the allocations have held steady. For the July reporting dates the figures were as follows: 1975–$604,289; 1976–$1,416,881; 1977–$1,319,761; 1978–$1,677,476 (Applicants' Exhibit 10, pages 33–36).

The Board finds that the sales and sales tax allocations reflect a strong commercial retail environment and are another indicator of the healthy economic conditions of the area.

The financial community has benefited from the economic prosperity of the area as reflected by bank deposit and savings and loan deposit figures. (Applicants' Exhibit 10, pages 18–19, 20, 37–47). In 1967 the Hidalgo County banks had total deposits of $163,629,000 and by 1977 (year-end) these deposits had reached $673,-044,000. From June 1977 to June, 1978, the deposits grew by over $96,000,000 to stand at $701,064,000. In the City of McAllen the total deposits of the four commercial banks grew from $130,913,000 in 1972 to $338,405,000 in 1977. The twelve month period from June, 1977 to June, 1978, the deposits grew by over $53,000,000 to stand at $318,885,000.

The Hidalgo County savings and loan associations saw their savings increase from $34,767,-619 in 1965 to $220,065,520 in 1977 for a 530% increase. The two McAllen based associations had a savings increase of 357% since 1970 and the savings stood at $182,839,161 as of December, 1977. (Applicants' Exhibit 10, pages 20, 43).

Housing construction permits have demonstrated that the economy's strength is extensive. In the City of McAllen there have been over 6,700 new dwelling units permitted since the beginning of 1970 (through May, 1978) for a dollar value of almost $132,000,000. The total construction for that period of time exceed $236,000,000. (Applicants' Exhibit 10, page 48).

While the Board has cited only some of the economic statistics found in the record, it has examined all the data brought forth in the record. The Board has reached the inescapable conclusion that the economy of both Hidalgo County and the City of McAllen is strong and expanding. The Board also finds that there exists in the community to be served a volume of business to render this bank profitable. With the reputation, standing and experience of the proposed board of directors of the Texas State Bank coupled with the economic data mentioned above and also contained in the record, the Board is compelled to conclude that the Texas State Bank could reach its deposit forecasts of $4,000,000 the first year of operation and $7,000,000 and $9,000,000 by the end of the second and third year respectively. The Board has examined the proposed budget found on pages 49 and 50 of Applicants' Exhibit 10 and finds it to be reasonable and attainable in this market.

The Board has also examined the various aerial photographs (Applicants' Exhibit 9) as well as the maps of McAllen (Applicants' Exhibits 6–8) and the testimony of the witnesses regarding the growth of McAllen and in particular the northern part of McAllen near and along both Tenth Street and Nolana. The Board has noted the development of residential, commercial, retail, professional and industrial facilities in the area and concludes that this development plus the growing McAllen economy demonstrates the public need for the proposed Texas State Bank to be located at Tenth and Nolana. Dr. Vinson expressed the opinion that this area of McAllen represents the majority of the growth occurring within the city at the present time (R. 169). The Board agrees with this opinion and finds it to be supported by the evidence in the record.

The Board is not unmindful of the testimony presented by the protestants to this charter application. The Board has taken that testimony into account in reaching the conclusions expressed by this order. The Board does not mean to imply that the protesting banks are failing to provide banking services to their customers. On the contrary, the Board is of the opinion that those banks are well-managed and profitable institutions. The Board does find from the evidence in the record, however, that the growth and prosperity of McAllen can certainly profitably sustain the chartering of the Texas State Bank and that the public interest would be served by granting the charter application.

bank shall be honestly conducted upon good and sound business principles"; that the proposed directors believed another bank was needed in the area; that they were subscribing to purchase stock for long–term investment; that they had good reputations for honesty in the community; and that they intended to devote the time necessary to discharge their duties as directors. There was also evidence that the interlocking directors might not have the capacity to serve both banks simultaneously and that

potential loyalty problems might arise if a dual director were called upon for business referrals.

Again, it is apparent from the record and the Board's order that it considered all the evidence and found that presented by the applicants to be more convincing. The Board's action is justified by substantial evidence contained in the record, and such action is fairly and reasonably supported by underlying facts contained in the order.[4] *Gage v. Railroad Commission, supra.*

4. The organizing directors of the proposed Texas State Bank are: Vannie E. Cook, Jr., Joseph V. LaMantia, Jack A. Whetsel, Paul G. Veale, Vernon F. Neuhaus, Jr., and Glen E. Roney. The background of each of these gentlemen was presented at the hearing and made a part of the record as Applicants' Exhibit 3. That exhibit reflects the following information concerning the organizing directors:

*Vannie E. Cook, Jr.:* Mr. Cook has been a resident of the City of McAllen for 50 years. He received a B.B.A degree from the University of Texas in 1948. Mr. Cook is a partner and owner of the McAllen Coca-Cola Bottling Company and a vice–president of Mayfair Minerals, Inc. of McAllen, a corporation which has interests in oil and gas production, real estate and ranching operations. He is a major stockholder in Valley Petroleum Distributors, a gasoline and oil distributorship which also has service station operations. Mr. Cook is a stockholder in the Southern State Bank and Merchants Park Bank, both in Houston and the Harlingen State Bank, Harlingen, Texas. He previously served as a director and major stockholder of the First National Bank, Harlingen, Texas. For the past thirty years he has served on numerous charitable and civic boards in McAllen and the Rio Grande Valley.

*Joseph V. LaMantia:* Mr. LaMantia is a long time resident of McAllen and Chairman of the Board of Directors of LaMantia–Cullum–Collier & Co., Inc., a corporation which is concerned with the growing, shipping and marketing of fresh vegetables and melons and operates packing sheds in the Rio Grande Valley. He is a partner in Needmore Ranch, Inc., a cow and calf operation with approximately 12,000 acres in Dimmit and Zavala Counties. Mr. LaMantia is also the president and major stockholder of L & F Distributors, the Anheuser–Bush distributor for Hidalgo County. Mr. LaMantia has served on numerous civic and charitable boards such as the Rio Grande Radiation Treatment and Cancer Research Foundation located in McAllen, the Executive Board of the Boy Scouts of America, president of the Texas Citrus and Vegetable Growers Association, legislative chairman of the Valley Chamber of Commerce, Democratic Committeeman for Senatorial District 27, Secretary of the Texas Board of Corrections and Chairman of the Criminal Justice Advisory Board.

*Vernon F. Neuhaus, Jr.:* A graduate of Texas A. & I. University, Mr. Neuhaus is active in investments, oil and gas production and ranching. He has had banking experience as an officer in the Snyder National Bank, Snyder, Texas, Chase Manhattan Bank, New York City, and the Citizens State Bank, Donna, Texas. He is a shareholder in the McAllen State Bank and a member of the bank's Board of Directors.

*Glen Roney:* Mr. Roney began his banking career with the San Benito Bank and Trust Company, San Benito, Texas, as a file clerk and left that bank in 1961 as a vice-president/loan officer and member of the board of directors to accept a position with the McAllen State Bank as vice–president and cashier and a member of the board of directors. In 1967 he was elected executive vice-president and chief executive officer and in 1972 he was elected president of the McAllen State Bank. In 1974 Mr. Roney organized the Harlingen State Bank and he currently serves as chairman of the Board of Directors of the bank. He is a former president and director of the First State Bank and Trust Company, Edinburg, Texas, and a former director of the following: First National Bank of Harlingen, University State Bank, Austin, and the Texas Bankers Association. He is a former president of the Rio Grande Valley Bankers Association, the Rio Grande Clearing House Association and numerous civic and charitable organizations throughout the Rio Grande Valley. Mr. Roney is currently a director and vice–president of Media Properties, Inc. of Brownsville, Texas, which owns and operates FM radio station KDUV, a member of the Texas Bankers Association Electronic Fund Transfer Committee, a director of the Texas Citrus and Vegetable Growers and Shippers Association, a director of the Rio Grande Radiation Treatment Center, a director of the McAllen Trade Zone, Inc., president of the South Texas Higher Education Authority, a director of the Council for South Texas Economic Progress, a member of the National Affairs Committee of the Texas Association Progress, a member of

As we have determined that there is substantial evidence in the record supporting the criteria set out in Article 342–305(A) and that there is an adequate recitation of facts underlying those statutory criteria contained in the order, we reverse the judgment of the district court and here render judgment that the order of the State Banking Board granting a charter to the proposed Texas State Bank of McAllen be in all things affirmed.

PHILLIPS, C. J., not sitting.

the National Affairs Committee of the Texas Association of Business and the Finance Member of the Texas Water Development Board. *Paul G. Veale*: A resident of McAllen for 30 years, Mr. Veale is a certified Public Accountant with firm offices in McAllen. Mr. Veale has also established a diversity of other enterprises, including a group of distributorships and real estate development projects. In addition to his responsibilities in business and the accounting profession, Mr. Veale has served on the McAllen City Council for eleven years and as Mayor of McAllen from 1963 to 1969. He has been a member of the International Bridge Board, McAllen Trade Zone Board, McAllen Industrial Board, the Rio Grande Valley Municipal Water Authority, the first president of the Rio Grande Valley Council of Governments and the Rio Grande Development Council. He is a director of the McAllen State Bank and a member of its trust committee.

*Jack A. Whetsel*: Mr. Whetsel is a 30 year resident of McAllen and the owner of the Broadway Hardware Company in McAllen. In addition to his business responsibilities, Mr. Whetsel is a director of the McAllen State Bank and Valley Federal Savings and Loan Association in McAllen. He is President of the Salvation Army, Chairman of the Hidalgo Child Welfare Board, a director of the McAllen Trade Zone, a member of the McAllen General Hospital, the Chamber of Commerce, Citizens League and the Valley Baylor University Association. He formerly served as a member of the McAllen City Commission, four years as a Mayor Pro Tem. of McAllen and Mayor of the City of McAllen for eight years from 1969 to 1977.

It is apparent to the Board that the proposed directors are a group of outstanding citizens of McAllen and their qualifications vastly exceed the minimum requirements contemplated by the Texas Banking Code.

The applicants asserted that they were acting in good faith and they executed the application (Applicants' Exhibit 1) with that intent and from a study of the overall record, the Board believes and finds that the applicants for the Texas State Bank are acting in good faith. The officer staff had not been selected and the applicants went forward at the hearing relying upon the Board's rule provision which permits them to proceed with the hearing without designation of the officers and permits the Board to approve a charter application subject to later approval of the officers of the proposed bank.