**CITY OF LEAGUE CITY, et al., Appellants,**

v.

**TEXAS WATER COMMISSION, et al., Appellees.**

No. 3–88–175–CV.

Court of Appeals of Texas, Austin.

Sept. 20, 1989.

W. Thomas Buckle, Scanlan & Buckle, Austin, for appellants.

Jim Mattox, Atty. Gen., Paul Elliott, Asst. Atty. Gen., Austin, James B. Blackburn, Jr., Mary W. Carter, Houston, for appellees.

Before POWERS, GAMMAGE and JONES, JJ.

JONES, Justice.

The City of League City and Galveston County Municipal Utility District No. 14

(appellants) appeal from a judgment of the district court affirming an order of the Texas Water Commission (Commission), appellee, which denied appellants' wastewater discharge permit application. The City of Dickinson, a protestant before the Commission, intervened in the district court as a party defendant and is an appellee in this Court. We will affirm the judgment of the district court.

In early 1986 appellants, as co-applicants, applied to the Commission for a wastewater discharge permit to serve a residential and commercial development known as Bay Colony, located within League City. The proposed Bay Colony Wastewater Treatment Plant would discharge approximately one million gallons per day of treated effluent into Borden's Gully, an intermittent stream which enters into the tidal section of Dickinson Bayou some two miles from the proposed plant site.

The Commission, created by Chapter 5 of the Texas Water Code to implement the laws of this State relating to water, is empowered in Chapter 26 to establish and maintain levels of water quality. Section 26.003 of the code provides as follows:

It is the policy of this state and the purpose of this subchapter to maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state; to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state; and to require the use of all reasonable methods to implement this policy.

Section 26.023 of the code specifically authorizes the Commission to promulgate rules for water quality standards, and gives the Commission "sole and exclusive authority to set water quality standards for all water in the state."

The Commission's water quality rules are presently contained in 31 Tex.Admin. Code §§ 307.1–307.10 (West Oct. 1, 1988).

Several sections are significant with respect to this appeal. Section 307.4 contains various "general criteria," including the following under subsection (b), labelled "aesthetic parameters":

Concentrations of taste and odor producing substances shall not interfere with the production of potable water by reasonable water treatment methods, impart unpalatable flavor to food fish including shellfish, result in offensive odors arising from the waters, or otherwise interfere with the reasonable use of the water in the state.

Other aesthetic standards include requirements that surface water be free of floating debris, suspended solids, settleable solids, and visible oil or grease; that waste discharges not cause persistent changes of turbidity or color; and that there be no persistent foaming or frothing. Other, more technical, criteria contain requirements such as the maintenance in "intermittent" and "unclassified" streams of a minimum dissolved oxygen concentration of 3.0 milligrams per liter.

Section 307.5 contains "antidegradation" policies and procedures which "apply to actions before the commission when such actions would increase pollutant loads to the water in the state." Under this section, it is declared to be the policy of the Commission that:

(1) existing uses [as defined in § 307.7] will be maintained and protected....;

(2) no activities subject to regulatory action which would cause significant degradation of waters exceeding fishable/swimmable quality will be allowed unless it can be shown to the commission's satisfaction that the lowering of water quality is necessary for important economic or social development....

\* \* \* \* \* \*

(4) the commission will not authorize or approve any waste discharge that will result in the quality of any water being lowered below water quality standards without complying with federal and state laws applicable to water quality standards amendment.

Pursuant to section 307.7 and Appendix A to section 307.10, the specific uses of Dickinson Bayou are designated as "contact recreation" and "high" aquatic life. "Contact recreation" is defined as "[r]ecreational activities involving a significant risk of ingestion of water, including wading by children, swimming, water skiing, diving, and surfing." 31 TAC § 307.3(a)(7). The minimum dissolved oxygen criteria for such uses is set at 4.0 milligrams per liter.

Section 16(b) of the Administrative Procedure and Texas Register Act, Tex.Rev. Civ.Stat.Ann. art. 6252–13a (Supp.1989) (APTRA), requires that the final decision of an agency in a contested case must include findings of fact and conclusions of law, separately stated. The relevant findings (underlying fact-findings) and conclusions (ultimate fact-findings) made by the Commission in this case are as follows:

## CONCLUSION OF LAW NO. 3

3. The proposed discharge of effluent would not maintain the quality of water in the State consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, or the economic development of the State.

## CONCLUSION OF LAW NO. 4

4. The issuance of Permit NO. 13255–01 would controvert the policy of encouraging and promoting the development and use of regional and areawide waste collection, treatment and disposal systems to serve the waste disposal needs of the citizens of the state. *Texas Water Code* §§ 26.003, 26.023 and 31 TAC 333.11 [now 31 TAC § 307.1].

## FINDING OF FACT NO. 5

5. The proposed discharge would be into Borden's Gully, thence into Dickinson Bayou in Segment No. 1103 of the San Jacinto–Brazos Coastal basin. The uses deemed desirable for that Segment include contact recreation and high-quality aquatic habitat. If the proposed discharge is allowed, the water quality standards will be violated and the uses associated with those standards will be impaired.

## FINDING OF FACT NO. 6

6. A Streeter–Phelps water quality analysis of Borden's Gully failed to account for the tidal effects within the gully, which directly affect dissolved oxygen (DO) levels, and therefore the analysis fails to establish that the water quality of the receiving body of water would not be impaired.

## FINDING OF FACT NO. 7

7. The applicants' expert's testimony concerning taste and odor was speculative and contradictory and failed to establish that the discharge could meet the General Criteria of the Commission, as established in 31 TAC 333.17(a)(1) [now 31 TAC § 307.4(b)(1)].

## FINDING OF FACT NO. 8

8. A Qual–Tex dissolved oxygen analysis of Dickinson Bayou at low flow, high temperature conditions indicates D.O. of 2.0 milligrams per liter (mg/l) at the confluence of the bayou and Borden's Gully. The D.O. water quality standard for Dickinson Bayou is 4.0 mg/l. The water quality is already 50 percent lower than the standard and, therefore, militates against issuance of a new discharge permit that would result in more oxygen demanding material (BOD) entering Dickinson Bayou.

## FINDING OF FACT NO. 11

11. WCID# 1 is replacing its main plant and was willing to sell capacity in its new plant to GCMUDs 14 and 15.

## FINDING OF FACT NO. 12

12. The owners of Bay Colony and representatives of GCMUDs 14 and 15 reached an agreement on all principal terms for service with WCID # 1 in its new plant, although no official action has yet been taken and the City of League City is not in agreement. A service con-

tract with WCID #1 is a viable alternative to the proposed new discharge.

## FINDING OF FACT NO. 13

13. Another alternative is utilization of League City's Dallas Salmon Central Treatment Plant. A 54–inch force main connected to the Dallas Salmon Plant is located approximately 12,000 feet north along IH 45 from Bay Colony.

The Water Code does not expressly define the scope of judicial review of the Commission's orders. Tex.Water Code Ann. § 5.351 (1988). Pursuant to Section 19(e) of APTRA, therefore, we are required to reverse or remand the case for further proceedings

> if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) in violation of constitutional or statutory provisions;
>
> (2) in excess of the statutory authority of the agency;
>
> (3) made upon unlawful procedure;
>
> (4) affected by other error of law;
>
> (5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or
>
> (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Appellants challenge the Commission's findings and conclusions here as not supported by substantial evidence; in addition, Conclusion of Law No. 4 is attacked as being arbitrary and capricious, an abuse of discretion, and in excess of the Commission's statutory authority. We conclude that a review of the challenges to Findings of Fact Nos. 6, 7, and 8 is dispositive of this appeal.

The standards of review under the substantial evidence rule are now reasonably well established in Texas:

> 1. The findings, inferences, conclusions, and decisions of an agency are presumed to be supported by substantial evidence, and the burden is on the party contesting the order to prove otherwise.
>
> 2. In applying the substantial evidence test, the reviewing court is prohibited from substituting its judgment for that of the agency as to the weight of the evidence of questions committed to agency discretion.
>
> 3. Substantial evidence is more than a scintilla, but the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence.
>
> 4. The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency.
>
> 5. The agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action.

*Texas Health Facilities Commission v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452–53 (Tex.1984). It has also been stated that "substantial evidence" is less than that needed to sustain a verdict being attacked as against the great weight and preponderance of the evidence. *Browning–Ferris, Inc. v. Texas Department of Health,* 625 S.W.2d 764, 768 (Tex.App.1981, writ ref'd n.r.e.); *State Banking Board v. Valley National Bank,* 604 S.W.2d 415, 420 (Tex.Civ.App.1980, writ ref'd n.r.e.); *see also* Reavley, *Substantial Evidence and Insubstantial Review in Texas,* 23 Sw.L.J. 239, 241–42 (1969).

With respect to Finding of Fact No. 6, appellants' main expert witness, Dr. Philip Bedient, testified that he had performed two different analyses of the impact of the proposed discharge on the water quality of Borden's Gully and Dickinson Bayou: the "Streeter–Phelps" and the "Qual–TX." It is undisputed that the Streeter–Phelps analysis did not take into account potential tidal effects within Borden's Gully. The written report produced from this analysis stated that "[t]he dissolved oxygen profile for the lower 1000 feet of Borden's Gully and the downstream sections of Dickinson

Bayou were not considered in this study. These reaches are tidal and cannot be adequately described by the model." It is also undisputed that incoming tides can slow the velocity of the effluent in the stream and thus retard the reaeration rate. The rate of reaeration refers to the length of time necessary for dissolved oxygen, a critical variable in water quality, to rise to acceptable levels. The Streeter–Phelps analysis showed dissolved oxygen levels dropping dramatically, to below 4.0, in the last 1,000 feet of the model (which did not include the last 1,000 feet of Borden's Gully). An incoming tide which slowed velocity in the last 1,000 feet of the gully could potentially cause a further drop in dissolved oxygen as the stream entered Dickinson Bayou. In the absence of an analysis of possible tidal effects within the lower reaches of Borden's Gully, the Commission was entitled to conclude that the Streeter–Phelps model failed to establish that water quality would not be impaired. Accordingly, although it did not speak to the Qual–TX analysis, Finding of Fact No. 6 itself is supported by ample evidence.

With respect to Finding of Fact No. 7, Dr. Bedient testified on several occasions that he did not have enough information to form an opinion on the effect of the effluent from the proposed plant on taste- and odor-producing substances. At one point, however, Dr. Bedient testified that he thought there would be "minimal impact" on taste and odor in the stream. Another expert testified for appellants that the proposed plant would be designed to eliminate odors *from the plant*, but he did not testify about possible taste and odor problems in the receiving bodies of water. The general criteria mentioned in Finding of Fact No. 7, presently contained in 31 TAC § 307.4(b)(1), clearly refers to taste- and odor-producing substances *in the receiving water*. Accordingly, we hold that there was substantial evidence to support the finding that appellants failed to establish that the discharge would meet the taste and odor portions of the general criteria.

With respect to Finding of Fact No. 8, appellants concede that under worst-case conditions (low flow, high temperature) the existing dissolved oxygen levels of Dickinson Bayou are substandard. The minimum dissolved oxygen level allowable for the Bayou is 4.0 milligrams per liter; actual levels reach as low as between 1.0 and 2.0 milligrams per liter. Appellants contend, however, that "[t]hough Borden's Gully would contribute water with higher BOD [biochemical oxygen demand] than that indicated in Dickinson Bayou samples taken in 1984, dilution due to the Bayou's very large cross-sectional area and disbursive effect should make the impact of Borden's Gully BOD load negligible." The gist of this argument seems to be that Borden's Gully would simply not contribute enough additional biochemical oxygen demand to make much difference to the already poor water quality of Dickinson Bayou. While not an illogical argument, it does not compel the conclusion that the Commission's finding is without a reasonable basis in the record. Reasonable minds could conclude that adding even a relatively small amount of biochemical oxygen demand to an already substandard condition would, in the long run, not be in the best interest of Dickinson Bayou water quality standards. It is to precisely this type of agency expertise and discretion that courts should defer.

We hold that there is substantial evidence to support the Commission's Findings of Fact Nos. 6, 7, and 8, which, we can fairly and reasonably say, support Conclusion of Law No. 3. Although we are uncertain about the sufficiency of the evidence to support the last sentence of Finding of Fact No. 5, we need not address that issue. *Charter Medical*, 665 S.W.2d at 453.

Appellants also attack Conclusion of Law No. 4 and the underlying fact-findings supporting it, asserting that the Commission had no statutory authority to deny their application in order to encourage use of a regional or area-wide disposal system without first complying with the procedural requirements contained in Tex.Water Code Ann. §§ 26.082–26.084 (1988).

■ Conclusions of Law Nos. 3 and 4 constitute distinct legal grounds for the Commission's decision to deny the application. We are not bound by any particular legal ground made a basis for the Commission's ruling, provided that a valid basis exists for the action taken. *Charter Medical*, 665 S.W.2d at 452; *Railroad Commission v. City of Austin*, 524 S.W.2d 262, 279 (Tex.1975); *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939); *Railroad Commission v. Magnolia Petroleum Co.*, 130 Tex. 484, 109 S.W.2d 967, 971 (1937).

Appellants argue, however, that the Commission may have based its order on the *sum* of Conclusions of Law Nos. 3 and 4, or on a *balancing* of the policy considerations stated therein, and that both conclusions must be sustained in order for the Commission's decision to be affirmed. Nothing in the record, including the Commission's order, gives any indication that the Commission considered Conclusions of Law Nos. 3 and 4 to be anything other than two independent legal grounds for their decision. In the absence of some indication in the record that the Commission did in fact consider Conclusions of Law Nos. 3 and 4 in sum, we are not free to ignore the established rule of law set forth in the preceding paragraph. Having found substantial evidence to support the underlying fact-findings which support Conclusion of Law No. 3, and concluding that it forms a sufficient basis for upholding the Commission's order, we need not address appellants' attacks on Conclusion of Law No. 4 and its underlying fact-findings. Even if we were to find Conclusion of Law No. 4 erroneous, there would be no showing that substantial rights of the appellants had been prejudiced.

The judgment of the trial court is affirmed.

POWERS, Justice, concurring.

I concur in the judgment, but I disclaim the reasoning by which the majority come to it.

The majority purport to employ a substantial-evidence analysis to uphold certain declarations in the agency order, each of which is entitled "finding of fact." I refer to those "findings of fact" numbered six, seven, and eight, discussed in the majority opinion. Notwithstanding the name supplied by the agency, these patently are *not* "findings of fact" in the sense in which that term of art is used in administrative law. That is to say, the text of each shows them to be something *other* than a declaration of what the reality is concerning an evidentiary issue which is material to the case but without legal effect in and of itself. *See generally* Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases*, 16 Tex.Tech L.Rev. 475, 477–478 (1985). Applying to them the substantial-evidence test, on judicial review, is akin to checking the brakes of an automobile by reading the gasoline gauge. They require a different method of analysis, based on what they really are.

### "FINDING OF FACT NO. 8"

The declaration labeled "Finding of Fact No. 8" is actually a conclusion of law which may embody as well an underlying agency policy decision. The "finding" declares that the dissolved-oxygen aspect of the receiving waters, under some conditions and at a particular point, "is already 50 percent lower than the standard" established by the agency; and this "militates against issuance of a new discharge permit that would result in more oxygen demanding material" being diverted into Dickinson Bayou. As mentioned in the majority opinion, the appellant's concede the substandard state of the receiving waters and argue that their proposed effluent simply will not make much difference.

The word "militate" means in ordinary usage that the undisputed, existing, substandard state of the receiving waters is a factor to which the agency *assigned weight or effect* in *reaching* some determination. Thus, "finding of fact" number eight rejects on its face any idea that it might itself be a *determination* of any kind, whether of law or fact; and it is rather fictitious to purport to look for evidence which reason-

ably supports a finding the agency never made at all.

The actual dispute may only be whether the agency could validly make the substandard state of the receiving waters a legally relevant factor in deciding some issue pertinent to the agency's administration of the permit procedure authorized in Tex.Water Code Ann. § 26.027 (1988). This plainly is not a question which a court may review under the substantial-evidence test of Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ. Stat.Ann. art. 6252–13a, § 19(e)(5) (Supp. 1989). It is, instead, a question of statutory construction to be determined by an interpretation of the powers, functions, duties, and discretion assigned the agency in the Texas Water Code, particularly in Chapter 26. In other words, it is a question of law, and perhaps a complicated one at that, reviewable by a court under AP-TRA § 19(e)(1), (2), (4), or (6). The parties have not briefed the issue on that basis, having instead confined their argument to appellants' "no evidence" theory. Accordingly, I concur that the point of error should be overruled.

## "FINDINGS OF FACT" SIX AND SEVEN

The declarations labeled "Finding of Fact No. 6" and "Finding of Fact No. 7" are actually *reasons* given by the agency for *declining to credit certain evidence* adduced by the appellants in attempting to carry their burden of proof regarding specific norms and standards necessary to obtain a permit: item six states that appellants failed to establish that water quality would not be impaired in the receiving waters because their "Streeter–Phelps" analysis "failed to account for" tidal effects; item seven states that appellants failed to establish their effluent discharge would meet certain criteria because the opinion testimony given by their expert witness "was speculative and contradictory" concerning the factors of taste and odor.

The appellants contend their evidence under number seven *required* belief because it was *uncontradicted,* and I will assume

that the evidence under number seven was the same. This poses the best case possible for the appellants, and requires that we consider these issues: when may an agency, as fact finder, decline to infer the facts suggested by uncontradicted evidence on the ground that the agency chooses not to believe it for some reason; and how should a court review a claim that the agency was legally bound to believe the evidence and infer the facts which the evidence implied?

"It is a generally sound rule that questions of credibility are not reached by the substantial evidence test." Jaffe, Judicial Control of Administrative Action, at 606 (1965) [hereinafter *Judicial Control*]. This is implied in APTRA § 19(e)(5), which limits the scope of a reviewing court's substantial-evidence inquiry to "the *reliable* and probative evidence in the record as a whole." (emphasis added). When an agency explicitly declares, as it did here, that it could *not* make the findings of fact necessary to establish a required norm or standard, because it did not credit the proponent's evidence, the court is obviously not faced with the substantial-evidence inquiry: could the fact finder reasonably infer its findings from the reliable and probative evidence in the record as a whole? Such an inquiry is simply not possible in a case like the present where the proponent contends certain findings *should* have been made, because his evidence was undisputed, *but were not.* Moreover, the reviewing court may not *itself* review the record as a whole and determine whether the proponent's evidence was "reliable and probative," for this would amount to substituting the court's judgment for that of the agency on the weight of the evidence—a course which APTRA § 19(e) expressly forbids the reviewing court to follow. "A court addressing itself to credibility may end by 'weighing the evidence.'" *Judicial Control, supra,* at 606.

Reviewing courts often state that the agency is the sole judge of the credibility of witnesses, which is true as a general statement; but reviewing courts do in some instances set aside agency orders which rest on an agency decision that a

party's undisputed evidence is not worthy of belief. *Judicial Control, supra,* at 606–10. The difficult issue raised in such cases concerns the exact nature of the scope of judicial review. Various epithets and metaphors abound, ranging from an agency's "irrational" disregard of uncontradicted evidence; to its permissible disregard of uncontradicted evidence that carried "its own death wound"; and finally to statements that come perilously close to sanctioning a reviewing court's substitution of its own judgment, for that of the agency, on the weight of the evidence. The issue is one of the more unsettled and difficult in administrative law, but *in any event* the scope of review is that of APTRA § 19(e)(6): Was the agency action "arbitrary or capricious," an "abuse of discretion," or a "clearly unwarranted exercise of discretion." It manifestly is *not* a question which comes within the substantial-evidence test of APTRA § 19(e)(5), for a *non*-finding simply cannot be subjected to a substantial-evidence analysis.

In the present case, the agency gave specific reasons for refusing to credit the appellants' evidence. I would hold the reasons adequate on their face and sufficiently explained. 5 Davis, Administrative Law Treatise § 29.26 at 456 (2d ed. 1984).

I believe finally that the agency would have denied the permit on the strength of its conclusion of law number four alone.

Accordingly, I would affirm the judgment below.