# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-06-00580-CV

---

**City of Dallas, Appellant**

**v.**

**Railroad Commission of Texas and Atmos Energy Corporation,
as successor by merger to TXU Gas Company, Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-04-002652, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

The City of Dallas appeals from a district court judgment affirming a final order of the Railroad Commission of Texas (Commission) approving rates applicable to all areas in Texas served by TXU Gas Corporation, the predecessor to appellee Atmos Energy Corporation (TXU Gas). At all relevant times, TXU Gas or one of its predecessors has been the gas utility that serves much of north and central Texas, including the Dallas area. In previous proceedings, the utility's rates had been set on a municipality-by-municipality or region-by-region basis. In the present proceeding, however, the commission, for the first time, approved TXU Gas's request to set rates on a "statewide" basis, utilizing data from TXU Gas's entire system in Texas to determine rates that it imposed on its customers without regard to local or regional boundaries.

The chief focus of Dallas's appeal is the commission's departure from what it terms the "long standing practice and precedent" of setting separate rates for a region termed the

"Dallas Distribution System," or "Dallas System." In prior rate proceedings, the "Dallas Distribution System" had been described as "an integrated local gas distribution system comprised of approximately 3,400 miles of pipe . . . [that] encompasses over 370 square miles and serves approximately 236,000 customers in Dallas, Highland Park, University Park, and Cockrell Hill. . . comprised of approximately 211,000 residential customers; 26,000 commercial customers; and 200 industrial or transportation customers." Dallas's central contention on appeal is that it presented uncontroverted evidence that TXU Gas's revenue requirement or cost of service within the "Dallas Distribution System" is unique and lower compared to other areas served by the utility, thereby establishing that the statewide rates were unjust and discriminatory to customers in that area.

In three issues, Dallas urges that the commission's imposition of statewide rates on "Dallas Distribution System" customers is not supported by substantial evidence or adequate findings, that TXU Gas's published notice of its proposed rate change was deficient regarding its impact on those customers, and that the commission lacked jurisdiction to set statewide rates because it had not acquired jurisdiction to set rates within all municipalities in TXU Gas's service area. We will overrule these issues and affirm the district court's judgment.

## BACKGROUND

### Statutory framework

In the Gas Utility Regulatory Act (GURA), the legislature has determined that "[g]as utilities are by definition monopolies in the areas they serve" such that "the normal forces of competition that regulate prices in a free enterprise society do not operate." Tex. Util. Code. Ann. § 101.002 (West 2007). As a substitute for market competition, the legislature has implemented "a comprehensive and adequate regulatory system for gas utilities to assure rates,

2

operations, and services that are just and reasonable to the consumers and the utilities." *Id.* Under GURA, "the railroad commission is vested with all the authority and power of this state to ensure compliance with the obligations of gas utilities" under the act. *Id.* § 104.001(a) (West 2007). The railroad commission has exclusive original jurisdiction over the rates and services of gas utilities that distribute gas ("distribution" rates or services) in areas outside a municipality, as well as those that transport, deliver or sell natural gas to a gas utility that distributes gas to the public ("pipeline" rates or services). *Id.* § 102.001(a) (West 2007). However, the legislature has delegated to the governing body of each municipality, in the first instance, exclusive original jurisdiction over distribution rates and services within its municipal boundaries, subject to the municipality's right to surrender such jurisdiction to the commission by ordinance or local option election. *See id.* §§ 102.001(a)(1)(B), 102.002(b), 103.001, 103.003 (West 2007).

Under GURA, a gas utility may charge customers only rates set forth on schedules filed with each regulatory authority having original or appellate jurisdiction over those rates. *See id.* §§ 102.151, 104.002, 104.005 (West 2007). A gas utility desiring to increase its rates must file a statement of such intent with the regulatory authority having original jurisdiction over those rates at least 35 days before the effective date of the proposed increase. *Id.* § 104.102(a) & (b) (West 2007). The statement of intent must include proposed revisions of tariffs and schedules and "a detailed statement" of each proposed increase, the effect the proposed increase is expected to have on the utility's revenues, and each class and number of utility consumers affected. *Id.* § 104.102(c) (West 2007). The utility must also "publish, in conspicuous form, notice to the public of the proposed increase once each week for four successive weeks in a newspaper having general circulation in each county having territory affected by the proposed increase." *Id.* § 104.103(a)(1) (West 2007).

3

The regulatory authority shall hold a hearing on the proposed rate increase if the increase would constitute a "major" change, one that would increase the utility's aggregate revenues more than the greater of $100,000 or 2 percent. *Id.* §§ 104.101, 104.105 (West 2007). The regulatory authority shall "give preference" to the hearing and "decide the questions as quickly as possible." *Id.* § 104.106 (West 2007). Pending the hearing and a decision, the regulatory authority has authority to suspend the operation of the proposed rate schedule for a specified period. *Id.* § 104.107(a), (b) (West 2007). "If the regulatory authority does not make a final determination concerning a schedule of rates before expiration of the applicable suspension period, [it] is considered to have approved the schedule." *Id.* § 104.107(c).

In GURA chapter 104, subchapter B, the legislature addressed certain components of a regulatory's authority's calculation of a gas utility's rates. It prescribed various calculations to determine the rate base and expenses, *see id.* §§ 104.053-.058 (West 2007), and directed that the rate of return "may not . . . yield[] more than a fair return on the adjusted value of the invested capital used and useful in providing service to the public." *Id.* § 104.052 (West 2007). Further, "[i]n establishing a gas utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses." *Id.* § 104.051 (West 2007).

Additionally, the regulatory authority must ensure that each rate within its jurisdiction that a gas utility makes, demands or receives is "just and reasonable." *Id.* § 104.003(a) (West 2007). "A rate may not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer." *Id.* Further, a gas utility may

4

not (1) "grant an unreasonable preference or advantage concerning rates or services to a person in a classification"; (2) "subject a person in a classification to an unreasonable prejudice or disadvantage concerning rates or services"; or (3) "establish or maintain an unreasonable difference concerning rates of services between localities or between classes of service." *Id.* § 104.004 (West 2007).

"In establishing a gas utility's rates, the railroad commission may treat as a single class two or more municipalities that a gas utility serves if the commission considers that treatment to be appropriate." *Id.* § 104.003(a). Furthermore, the commission has provided by rule that "environs" rates—unincorporated areas near incorporated cities and towns—"may be the same rates as those in effect in the nearest incorporated area in Texas served by the same utility where gas is obtained from at least one common pipeline supplier or transmission system." 16 Tex. Admin. Code § 7.220(a) (2008). Conversely, absent commission approval, a gas utility's rates for an area not in a municipality may not exceed 115 percent of the average of all rates for similar services for all municipalities served by the same utility in the same county as that area. Tex. Util. Code Ann. § 104.006 (West 2007).

If, after hearing, the regulatory authority finds the rates are "unreasonable or in violation of law," it shall "enter an order establishing the rates the gas utility shall charge or apply for the service in question." *Id.* § 104.110(a) (West 2007). The gas utility must thereafter comply with those rates until changed in accordance with GURA. *Id.* § 104.110(b) (West 2007).

In addition to its original jurisdiction, the railroad commission has exclusive appellate jurisdiction to review an order or ordinance of a municipality exercising original jurisdiction. *Id.* § 102.001(b). "A party to a rate proceeding before a municipality's governing body may appeal the governing body's decision to the railroad commission." *Id.* § 103.051 (West 2007). Such an appeal

5

is de novo, and based on the test year presented to the municipality, adjusted for known changes and conditions that are measured with reasonable accuracy. *Id.* § 103.055(a) (West 2007). The commission "shall enter a final order establishing the rates [it] determines the municipality should have set in the ordinance to which the appeal applies." *Id.* § 103.055(b) (West 2007).

**Proceedings below**

In May 2003, TXU Gas filed with the railroad commission a statement of intent to change its distribution and pipeline rates over its entire system in Texas and seek approval of new "statewide rates" applicable to all of its distribution and pipeline customers. It filed similar statements with each of the approximately 440 municipalities within its service area. *See id.* § 103.001 (exclusive original jurisdiction of each municipality over gas utility rates, operations and services within its boundaries). In response to TXU Gas's filings, fifty-five municipalities purported to surrender their jurisdiction over TXU Gas's rates to the commission. *See id.* § 103.003. Another group of thirty-one municipalities either took no action at all or suspended TXU Gas's proposed rate change and then took no further action. *See id.* § 104.107 (rate suspension and deemed approval). The remaining municipalities, including Dallas, denied or dismissed TXU Gas's rate change proposal. In each case, regardless of the municipality's action, TXU Gas appealed it to the railroad commission. *See id.* §§ 102.001(b) (commission has "exclusive appellate jurisdiction to review an order or ordinance of a municipality exercising exclusive original jurisdiction"), 103.051 ("A party to a rate proceeding before a municipality's governing body may appeal the governing body's decision to the railroad commission"). The commission consolidated all of TXU Gas's proceedings into a single docket. Many parties intervened, including Dallas, numerous other cities through the

6

Allied Coalition of Cities (ACC) or the Association of TXU Municipalities, and various large gas consumers.

A hearing spanning eighteen days was held before commission hearing examiners. Of relevance to this appeal, Dallas opposed TXU Gas's proposal that the commission set statewide rates rather than rates specific to the "Dallas Distribution System," as it had in the past. Dallas presented the expert testimony of Daniel L. Lawton concerning "Dallas Specific Versus Statewide Rate Policy Issues." Lawton opined that TXU Gas's cost to serve Dallas Distribution System customers was substantially lower than its statewide or systemwide average due to factors including "the unique characteristics of a gas distribution system in a large metropolitan area" and that "Dallas customers have been paying down enormous investment levels in the city associated with safety replacement and maintenance." Lawton urged that, consequently, shifting to statewide rates would force Dallas Distribution System customers to subsidize TXU Gas customers in other parts of the state, would be "unfair, unjust, and unreasonable,"and would cause short-term "rate shock."[1] Instead of TXU Gas's "statewide, one size fits all" approach to rates, Lawton maintained,

---

[1] As Lawton summarized his conclusions:

Historically, Dallas customers have paid rates for the localized system investment and costs that have resulted in lower rates relative to the statewide system. By blending or averaging system costs into one rate, [TXU Gas] is eliminating the Dallas Distribution System benefits of lower costs that Dallas Distribution System customers have paid for over the years. The impact or savings associated with the Dallas customers' past payments for plant and cost of service is now being shifted to all other customers. As a result, Dallas Distribution System customers (residential, commercial, and industrial) receive increases that in some cases are shocking, while customers in other parts of TXU Gas'[s] service area receive no increases or rate decreases.

the commission should set rates for the "Dallas Distribution System" separately from the rest of TXU Gas's system.

TXU Gas presented the testimony of Steven Houle, who opined that a statewide rate filing would save rate case expenses and that statewide rates would be more "transparent," easier to understand, would help equalize the effects of TXU Gas's investments across its service area, and would help ensure similarly-situated customers were treated equally throughout its system. In rebuttal testimony, Houle also challenged "Mr. Lawton's . . . erroneous premise that the Dallas Distribution System is an isolated, independent distribution system that is materially different from other systems served by TXU Gas." According to Houle, "[r]ather than being independent and isolated, the Dallas Distribution System is uniquely inter-related with other systems due to the fact that it is completely surrounded by other large, densely populated areas" in which customers "often utilize the same pipeline and distribution network that serves customers in the Dallas Distribution System." "Due to this sharing of facilities," Houle added, "in prior gas cases [TXU Gas] has had to develop complex allocations to divide the cost of service associated with shared facilities between the Dallas Distribution System and surrounding cities." Houle further testified that "I have reviewed [TXU Gas's] operating costs in detail, and there is no cost data that I have seen that suggests that it is cheaper to serve customers in the Dallas Distribution System than to serve customers in adjacent cities or other parts of the state." Houle concluded that the "net effect of [Lawton's] recommendation [was] that customers outside of the Dallas Distribution System should subsidize the rates of customers in the Dallas Distribution System."

Terming this "[a] fundamental policy issue the Commission must decide," the hearing examiners recommended in their proposal for decision that the commission approve and set

distribution rates on a system-wide basis for TXU Gas.[2]  As for what these statewide rates would be, the examiners recommended that the commission adopt some components of TXU Gas's proposed rates but not others.   The commission adopted the hearing examiner's recommendations that are material to this appeal, including the recommendation to approve and set TXU Gas's rates on a statewide basis.  In its final order, the commission adopted approximately one-hundred detailed findings of fact regarding the reasonableness of various components of TXU Gas's rate base, expenses, and the rate of return.  Following these findings were thirty-seven findings regarding cost-allocation and rate design issues. Among other things, the commission found that specified rates for six customer rate classes were reasonable: Residential Sales, Commercial Sales, Industrial Sales, Transportation Service, City-Gate Service, and Pipeline Transportation Service.  Based on these findings, the commission made conclusions of law concerning whether the rates complied with statutory requirements.  These included:

> 8.      In accordance with the stated purposes of the Texas Utilities Code, Subtitle A, expressed under Tex. Util. Code Ann. § 101.002 . . . the Commission has assured that the rates, operations, and services established in this docket are just and reasonable to customers and to the utilities.

---

[2] The examiners reasoned:

TXU primarily argues that the advantages of system-wide rates are economic.  While this proceeding has no doubt been long, complex, and expensive, the Examiners find it a difficult prospect to accept that the alternative to system-wide rates—the utility having a myriad number of rates, tariffs, and corresponding rate cases—is more efficient and less costly.  Dallas argues that it is entitled to be treated as a separate and independent system for rate making purposes.  However, the weight of the evidence does not indicate that Dallas is a separate and distinct utility system with unique costs that mandate consideration apart from the remainder of TXU's system.  The Examiners therefore recommend the Commission approve and set distribution rates on a system-wide basis for TXU.

. . .

23. The rates proposed by TXU are in accordance with Tex. Util. Code Ann. § 104.006 . . . because the rates established for customers of each environs area do not exceed 115 percent of the average of all rates for similar services for all municipalities served by TXU in the same county.

24. TXU's intent to set system-wide rates is consistent with 16 Tex. Admin. Code § 7.220 (2002), that provides that rates applicable to customers located in the environs may be the same as those rates in the nearest incorporated area in Texas served by the same utility.

. . .

25A. The revenue, rates, rate design, and service charges . . . set out in this Order and accompanying schedules, are just and reasonable, are not unreasonably preferential, prejudicial, or discriminatory, and are sufficient, equitable, and consistent in application to each class of consumer, as required by Tex. Util. Code Ann. § 104.003 . . . .

26. The overall revenues as established by the findings of fact and attached schedules are reasonable; fix an overall level of revenues for TXU that will permit the company a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public over and above its reasonable and necessary operating expenses, as required by Tex. Util. Code Ann. § 104.051 . . .; and otherwise comply with Chapter 104 of the Texas Utilities Code.

27. The revenue, rates, rate design and service charges approved herein will not yield to TXU more than a fair return on the adjusted value of the invested capital used and useful in rendering service to the public, as required by Tex. Util. Code Ann. § 104.052 . . . .

28. The rates established in this docket comport with the requirements of Tex. Util. Code Ann. § 104.053 . . . and are based upon the adjusted value of invested capital used and useful, where the adjusted value is a reasonable balance between the original cost, less depreciation, and current cost, less adjustment for present age and condition.

. . .

42. The rate setting methodologies set forth in Tex. Util. Code Ann. § 104.051 *et seq*. were used to set the rates in this proceeding.

Although the commission's findings and conclusions referred throughout to statewide data and rates, the commission did not make specific findings and conclusions comparing the relative benefits of statewide rates with separate rates unique to the "Dallas Distribution System."

Several parties, including Dallas, Atmos, and ACC filed suits for judicial review of the commission's order in the district court. The district court rendered a final judgment affirming the commission's final order in all respects. Dallas, Atmos, and ACC each appealed to this Court. Atmos and ACC ultimately dismissed their appeals pursuant to settlement, leaving Dallas as the sole appellant.

**ANALYSIS**

Dallas brings three issues on appeal. In its first issue, it argues that the commission failed to make adequate findings in support of its decision to impose statewide rates rather than rates unique to the "Dallas Distribution System" and that the decision is arbitrary, capricious, and not supported by substantial evidence. In its second issue, Dallas contends that TXU Gas's published notice of its proposed statewide rate change was misleading and defective as to its impact on "Dallas Distribution System" customers. In its third issue, Dallas asserts that the commission never acquired jurisdiction over TXU Gas's rates in numerous municipalities within its service area, rendering invalid the statewide rates and their underlying calculations.

**Standard of review**

We review the railroad commission's decision in a ratemaking proceeding to determine whether it is supported by substantial evidence. *CenterPoint Energy Entex v. Railroad*

11

*Comm'n of Tx.*, 213 S.W.3d 364, 369 (Tex. App.—Austin 2006, no pet.). Under this standard, we may not substitute our judgment for that of the commission on the weight of the evidence on questions committed to the commission's discretion. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, we shall reverse and remand the commission's order if Dallas's substantial rights have been prejudiced because the commission's findings, inferences, conclusions, or decisions; (1) violate a constitutional or statutory provision; (2) exceed the commission's statutory authority; (3) were made through unlawful procedure; (4) were affected by other error of law; (5) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (6) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.*

The commission's order is presumed valid and Dallas bears the burden of showing a lack of substantial evidence. *CenterPoint Energy Entex*, 213 S.W.3d at 369 (citing *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994) & *Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 733 (Tex. App.—Austin 2000, no pet.)). We review the commission's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Id.* at 370; *see* Tex. Gov't Code Ann. § 2001.174; *Heat Energy Advanced Tech., Inc. v. West Dallas Coal.*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied).[3]

---

[3] To the extent this analysis entails questions of statutory construction, these are questions of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). However, with regard to a statute that an agency is

To constitute substantial evidence, the evidence in its entirety must be sufficient to allow reasonable minds to have reached the conclusion that the agency must have reached to justify the disputed action. *Id.* (citing *Texas State Bd. of Dental Exam'rs v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988)). The evidence in the record may preponderate against the agency's decision and still provide a reasonable basis for the decision and satisfy the substantial evidence standard. *Id.* (citing *Nucor Steel v. Public Util. Comm'n*, 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.)).

Whether the commission's order was supported by substantial evidence is a question of law. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The district court's judgment is thus not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal of that judgment, we consider the same question presented to the district court: whether the commission's order was supported by substantial evidence. *See Montgomery*, 34 S.W.3d at 562.

**Statewide vs. "Dallas Distribution System" rates**

In its first issue, Dallas argues that the commission's order setting statewide rates for TXU Gas was not supported by substantial evidence and was an abuse of discretion because the evidence establishes that the rates are unduly prejudicial, discriminatory, and not just and reasonable

---

charged with enforcing, we give "serious consideration" to the agency's construction of it, so long as that construction is reasonable and consistent with the statutory language, and this is particularly true when the statute involves complex subject matter within the agency's area of expertise. *See CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coal. of Cities*, 252 S.W.3d 1, 27-28 (Tex. App.—Austin 2008, pet. filed); *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise or deal with a nontechnical question of law.") (internal citation omitted).

in their effect on "Dallas Distribution System" customers. Dallas emphasizes that it presented evidence that the "Dallas Distribution System" is an integrated distribution system with different costs than other areas of TXU Gas's system. *Cf. City of Corpus Christi v. Public Util. Comm'n*, 572 S.W.2d 290, 294-95 (Tex. 1978) (municipality, not electric utility, had burden of allocating or separating municipality's portion of utility's systemwide costs). It asserts that TXU Gas presented no competent evidence to controvert its proof regarding the nature and costs of the "Dallas Distribution System" or otherwise justify statewide rates. Relatedly, Dallas complains that the commission failed to make any findings of fact specifically addressing "the issue of state-wide rates versus rates for the Dallas Distribution System" and that it was required to make such findings because they concern "underlying findings" supporting its decision to approve statewide rates. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 449-53 (Tex. 1984).

Because adequate findings of underlying fact are an essential prerequisite to meaningful substantial-evidence review, *see, e.g.*, *State Banking Bd. v. Valley Nat'l Bank*, 604 S.W.2d 415, 419 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.),[4] we will begin by addressing Dallas's assertions that such findings are lacking here. As appellees observed during oral argument, Dallas did not raise this specific complaint in its motion for rehearing, and it is questionable whether

---

[4] As this Court observed in *Valley Nat'l Bank*:

> The purposes in requiring underlying facts are to require a full consideration of the evidence and serious appraisal of the facts on the part of the administrative agency; to inform the [appellants] of the facts found so that they may intelligently prepare and present an appeal to the courts; and to assist the courts in properly exercising their functions of reviewing the order.

*State Banking Bd. v. Valley Nat'l Bank*, 604 S.W.2d 415, 419 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.).

Dallas preserved this argument. *See, e.g.*, *Entergy Gulf States, Inc. v. Pub. Util. Comm'n*, 173 S.W.3d 199, 210 (Tex. App.—Austin pet. denied); *see also Bay City Fed. Sav. & Loan Ass'n v. Lewis*, 474 S.W.2d 459, 461-62 (Tex. 1971) (lack of findings by agency is independently reversible without regard to whether "lack of substantial evidence was urged"). Even if Dallas's complaint is preserved, we conclude that the commission was not required to make specific findings regarding the relative benefits of statewide rates for TXU Gas compared to separate rates for the "Dallas Distribution System."

The commission was required to make findings of "underlying facts," or the facts that supported its ultimate determinations that the statutory requirements for approving TXU Gas's rates had been satisfied. *See Charter Med.-Dallas, Inc.*, 665 S.W.2d at 449-53; *Valley Nat'l Bank*, 604 S.W.2d at 419; *see also* Tex. Gov't Code Ann. § 2001.141(b) & (d) (West 2008) ("ultimate findings" regarding whether statutory prerequisites to agency's action have been met that are "set forth in statutory language . . . must be accompanied by a concise and explicit statement of the underlying facts supporting the findings."). However, the commission was not "required to comment on every aspect of the record that may be relevant to its ultimate findings" or make findings on matters that it did *not* rely for support of its ultimate determinations. *Valley Nat'l Bank*, 604 S.W.2d at 419. Thus, to determine the findings the commission was required to make, we look to the statutory standards that governed the commission's decision to approve TXU Gas's rates. *Charter Med.-Dallas, Inc.*, 665 S.W.2d at 449.

We have summarized GURA's standards governing the commission's ratemaking decisions above. The legislature prescribed calculations to determine the rate base and expenses, *see* Tex. Util. Code Ann. §§ 104.053-.058, directed that the rate of return "may not . . . yield[] more

15

than a fair return on the adjusted value of the invested capital used and useful in providing service to the public," *id.* § 104.052, and required that the commission "establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses." *Id.* § 104.051. Rates must also be "just and reasonable," "not be unreasonably preferential, prejudicial, or discriminatory," and "be sufficient, equitable, and consistent in application to each class of consumer." *Id.* § 104.003(a). This type of statutory language has been held to afford an agency "discretion to determine the method of rate design," or how the utility's revenue requirement is distributed among its various services. *Texas Alarm & Signal Ass'n v. Pub. Util Comm'n*, 603 S.W.2d 766, 768 n.2, 772 (Tex. 1980). "Rate design is a complex problem that involves many factors," *id.* at 772, and the statute affords the commission considerable discretion regarding the precise factors to consider when addressing the statutory rate considerations and the weight to be given those factors. *See Nucor Steel*, 168 S.W.3d at 267-68. Such questions entail complex technical, economic and policy decisions that are uniquely appropriate for the commission's "informed judgment and expertise." *Id.* at 268 (internal citation omitted).

The legislature in GURA did speak to some geographic aspects of rate design. It specifically prohibited "an unreasonable difference concerning rates of services between localities or between classes of service," Tex. Util. Code Ann. § 104.004, and restricted the variations between rates within municipalities and their environs. *Id.* § 104.006; *see also* 16 Tex. Admin. Code § 7.220(a) (environs rates "may be the same rates as those in effect in the nearest incorporated area in Texas served by the same utility where gas is obtained from at least one common pipeline

16

supplier or transmission system."). There is no dispute that uniform, statewide rates would comply with these requirements. The legislature also contemplated that the commission could group customers from more than one municipality into a common rate class "if the commission considers that treatment to be appropriate." *Id.* § 104.003(a). Beyond this, the legislature left the geographic aspects of rate design to the commission's informed discretion. *See Nucor Steel*, 168 S.W.3d at 269 ("When [the statute] is silent as to an aspect of rate design, it demonstrates the legislature's intent to leave the decision within the [agency's] discretion.").

The gravamen of Dallas's argument is that because it presented evidence concerning certain factors that the commission might have considered in the design of TXU Gas's rates—that the "Dallas Distribution System" is an "integrated system" with unique costs for which rates have historically been set separately—the commission must make explicit findings regarding facts that supported Dallas's alternative regional rate design proposal. Although the commission was required to make findings of underlying facts *supporting* its approval of TXU Gas's statewide rates—and did make extensive findings to that end, as previously discussed—it was not required to make findings of facts regarding matters that it rejected and did *not* support its decision. *See Valley Nat'l Bank*, 604 S.W.2d at 419. We reject Dallas's contention that the commission failed to make adequate findings in support of its ratemaking decision.

We similarly conclude that the commission's decision to approve statewide rates is supported by substantial evidence. Dallas emphasizes its evidence that TXU Gas's costs of service are lower within the "Dallas Distribution System" than elsewhere in the utility's service area, dismisses TXU Gas's Houle's contrary statements as "conclusory" and incompetent, and urges that

17

substantial evidence does not support the commission's determination that TXU Gas's statewide rates were just, reasonable, and non-discriminatory (at least with respect to "Dallas Distribution System" customers). Taken to its logical extreme, Dallas's argument would imply that if a party presents evidence that a gas utility's proposed rates would disproportionately impact or exceed the cost of serving any particular area the party might identify—a region, city, neighborhood, or even a single customer—the utility must set individually-tailored rates for that area lest it "discriminate" against that area's customers. Dallas insists that the "Dallas Distribution System" is distinguishable from such arbitrary classifications because it is an "integrated system" for which rates have historically been set separately. However, the commission heard Houle's testimony that the "Dallas Distribution System" as it exists today is itself an arbitrary characterization because it is not "independent and isolated" but "uniquely inter-related with other systems due to the fact that it is completely surrounded by other large, densely populated areas" in which customers "often utilize the same pipeline and distribution network that serves customers in the Dallas Distribution System." Houle also testified as to several other justifications for statewide rates, including that such rates would reduce future rate case expenses, would be more "transparent" and easier to understand, and would help equalize the impact of TXU Gas's investments and costs across its service area. Although Dallas criticizes Houle's testimony for, among other things, reflecting a "background . . . in electric utilities" rather than gas utilities, it was the commission's province to determine the weight to be given his testimony. *See Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, pet. denied).

18

In sum, we conclude that the commission, weighing the myriad factors bearing on the design of TXU Gas's rates, had a reasonable basis in the record for approving statewide rates notwithstanding Dallas's evidence of the costs of service within the "Dallas Distribution System" if viewed in isolation. We overrule Dallas's first issue.

**Notice**

In its second issue, Dallas contends that TXU Gas's published notice of its proposed rate change to "Dallas Distribution System" customers failed to satisfy GURA's requirements and that this deficiency constituted a jurisdictional defect that rendered void the commission's subsequent increases to these customers' rates. Specifically, Dallas complains that the notice cited estimated statewide average rate increases for residential, commercial, and industrial customer classes that were lower than the average rate increases TXU Gas had proposed for Dallas customers in the statement of intent it filed with the city. Dallas urges that "the published notice was defective because it misleadingly described the increase proposed to customers of the Dallas Distribution System." We disagree.

Section 104.103 of GURA requires that a gas utility requesting a rate change shall:

(1)     publish, in conspicuous form, notice to the public of the proposed increase once each week for four successive weeks in a newspaper having general circulation in each county containing territory affected by the proposed increase; and

(2)     provide notice of the proposed increase to any other affected person as required by the regulatory authority's rules.

19

Tex. Util. Code Ann. § 104.103(a). TXU Gas published its notice once per week in newspapers of general circulation that included the *Dallas Morning News*. The notice contained information that included the following:

- TXU Gas intended "to implement a new schedule of rates for natural gas service to be charged to all of the customers served by the Company in the incorporated municipalities and unincorporated areas in the Company's statewide natural gas system."

- "The proposed revisions to the respective rate schedules will impact all classes of service and all fees and charges presently being assessed by the Company on its transmission and distribution system," including "approximately 1,344,030 residential, 125,603 commercial, and 1,441 industrial sales and transportation customers."

- As of the filing date of its statement of intent to change rates, the proposed rates were expected to "approximately produce" a 7.24 percent increase in the company's annual revenues from customers in the system. The proposed change would constitute a "'major' change as that term is defined by Section 104.101 of the Texas Utilities Code."

- "The proposed change will have differing impacts on individual customers, depending on consumption and current applicable rate schedules."

- A residential customer receiving a bill for 6 Mcf would incur "an average increase of approximately $3.59 per month a 9.4% increase"; a commercial customer receiving a bill for 30 Mcf would incur "an average increase of approximately $13.91 per month or a 8.7% increase"; while "[t]he effect of the proposed changes to rates and services for individual customers, which may be significant for individual customers, will vary depending on type of service and consumption."

The notice further indicated that "[a] complete copy of the Statement of Intent" was available for inspection in TXU Gas's business offices, provided the offices' address, and invited "[p]ersons with specific area questions or who want information about this filing" to contact TXU Gas via a toll-free telephone number. The notice also provided information regarding the procedures and deadlines for filing comments or protesting the proposed rate change. A final paragraph was written in Spanish and provided a contact phone number.

The commission found that TXU Gas "published public notice of the proposed rate changes once a week for four or more consecutive weeks in newspapers of general circulation in each county that contains territory affected by the proposed changes" and that its "publication of notice meets the statutory and rule requirements of notice and provides sufficient information to rate payers about the statement of intent." Based on these fact findings, the commission made the conclusion of law that "[i]n accordance with Tex. Util. Code Ann. § 104.103" and commission rules, "adequate notice was properly provided."

Dallas assails these findings on the basis that the statement of intent TXU Gas filed with Dallas requested an approximately 14 percent increase for a 6 Mcf residential customer and a roughly 12.73 percent increase for a 40 Mcf commercial customer, in contrast to the respective 9.4 percent and 8.7 percent estimated statewide average increases referenced in the published notice. Dallas accuses TXU Gas of having "withheld material facts from its notice, and affirmatively stat[ing] incorrect facts in its notice." However, the notice plainly advised TXU Gas's customers that the utility was implementing new rate schedules for natural gas services to be charged to all TXU Gas customers statewide, that the change would "impact all classes of service and all fees and charges presently being assessed," and that the proposed change would constitute a "major" change under GURA. The notice reflected that residential and commercial customers would each incur an "average increase" of roughly 9 percent in their charges. Dallas does not assert these estimates were inaccurate as to the average impact of the proposed changes on TXU Gas's customers systemwide. Further, the notice cautioned that "[t]he proposed change will have differing impacts on individual customers, depending on consumption and current applicable rate schedules," and referred customers

21

to the statement of intent and a toll-free telephone number for more information. The commission found that the notice complied with GURA section 104.303(a)'s requirement of "notice to the public of the proposed increase." We conclude that its construction of the statute is reasonable and entitled to deference, *see CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coal. of Cities*, 252 S.W.3d 1, 27-28 (Tex. App.—Austin 2008, pet. filed), and that substantial evidence supports the commission's finding that TXU Gas had complied with it.[5] We overrule Dallas's second issue.

**Jurisdiction to set statewide rates**

Finally, in its third issue, Dallas argues that the commission never acquired jurisdiction over the rates within eighty-six of the municipalities in TXU Gas's service area. Dallas's arguments are predicated on implications it draws from these cities' responses to its May 2003 statement of intent.

After TXU Gas filed its statement of intent with each municipality in its service area, thirty-one municipalities either took no action or suspended the effective date of TXU Gas's proposed change, then took no action. *See* Tex. Util. Code Ann. § 104.107. The parties agree that these municipalities were deemed to have approved TXU Gas's new distribution rates within their respective boundaries. *See id.* The other fifty-five cities purported to surrender their exclusive original jurisdiction over TXU Gas's distribution rates within their boundaries to the commission. *See id.* § 103.003. Dallas argues that because the cities purporting to surrender jurisdiction did not

---

[5] TXU Gas asserts that even if the published notice was defective, it would not constitute a jurisdictional defect. We need not reach this question because we conclude that substantial evidence supports the commission's findings that the notice complied with GURA.

22

act until after TXU Gas had filed its statement of intent, their action was ineffective because GURA section 103.003(c) provides that "[a] municipality may not elect to surrender its jurisdiction while a case involving the municipality is pending." *Id.* § 103.003(c). Consequently, Dallas continues, these municipalities actually retained jurisdiction and, by not taking further action to approve or reject TXU Gas's request, were deemed to have approved the new distribution rates within their boundaries. *See id.* § 104.107.

Because all eighty-six municipalities were thus deemed to have approved TXU Gas's proposed distribution rates within their boundaries, Dallas further reasons, "there was no case or controversy" as to TXU Gas's rates within those municipalities and TXU Gas's subsequent appeals were therefore ineffective to invoke the commission's appellate jurisdiction. "As a result," Dallas urges, "not only were the state-wide rates ordered not state-wide, but the Commission erred in not considering the revenues from those areas in setting rates for the rest of the state." The commission and TXU Gas respond that GURA section 103.051—"A party to a rate proceeding before a municipality's governing body may appeal the governing body's decision to the railroad commission"—does not condition a party's right to appeal on being aggrieved or having lost. *Id.* § 103.051.[6] TXU Gas adds that individual municipalities' deemed approvals of the rates it requested in its statement of intent would not resolve the controversy underlying its request because the deemed approvals would yield only piecemeal local rates, not the statewide rates it was seeking. As Dallas

[6] The appellees also dispute Dallas's assertions that the fifty-five municipalities who surrendered their jurisdiction could not validly do so once TXU Gas had filed its statement of intent. Because we conclude that the commission would have had appellate jurisdiction of TXU Gas's appeals from these cities even if these cities' surrenders of jurisdiction had not been effective, we need not reach that issue.

23

suggests, excluding data from these municipalities when setting an otherwise statewide rate would have invariably yielded inconsistencies between the two sets of rates.[7]  We agree with appellees that the commission had jurisdiction over TXU Gas's appeals from these municipalities.  We overrule Dallas's third issue.

## CONCLUSION

Having overruled Dallas's issues, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed

Filed:   November 6, 2008

---

[7]  We also observe that the statewide rates ultimately approved by the commission differed in some respects from the statewide rates TXU Gas proposed in its statements of intent.